## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ARCHER WESTERN – DE MOYA JOINT VENTURE<br><br>　　　　Plaintiff,<br><br>v.<br><br>ACE AMERICAN INSURANCE CO.<br><br>　　　　Defendants. | Case No.:<br><br>**COMPLAINT FOR BREACH OF CONTRACT, DECLARATORY JUDGMENT, AND JURY DEMAND** |

## **COMPLAINT**

WHEREFORE Plaintiff, Archer Western – de Moya Joint Venture (the "JV") by and through its attorneys, Saxe, Doernberger & Vita, P.C., hereby complains and alleges as follows against Defendant ACE American Insurance Company ("ACE"):

1. Through this Complaint the JV seeks recovery from Defendant, ACE, based on ACE's improper denial of the JV's insurance claim for direct physical loss and damage to property covered under a builders risk insurance policy, including (among other things) damaged concrete, rebar, forms, structures, and other building components at the I-395/S.R. 836 Reconstruction/Rehabilitation and signature bridge project located in Miami, Florida (the "Claim").

2. The JV seeks to recover the damages it has incurred as a consequence of ACE's failure to pay insurance benefits due for the JV's losses and damages in connection with the Claim, as well as declaratory relief for ongoing and accruing losses associated with the same.

## THE PARTIES

3. The JV is a joint venture comprised of two entities, Archer Western Contractors, LLC ("Archer") and The de Moya Group, Inc. ("de Moya").

4. Archer Western Contractors, LLC ("Archer") is a citizen of Delaware and Illinois, as it is a limited liability company formed in the State of Delaware with its principal place of business at 929 W Adams St, Chicago, Illinois 60607. Archer has three members. Each of its members is a citizen of the State of Illinois. Archer's members are the Matthew M. and Joyce S. Walsh 2020 Family Trust, the Daniel J. and Patricia R. Walsh 2020 Family Trust, and The Walsh Group, Ltd. E. Bryan Dunigan is the trustee for both trusts. Mr. Dunigan is an individual who is a citizen of the State of Illinois. The Walsh Group, Ltd. is an Illinois corporation.

5. The de Moya Group, Inc. ("de Moya") is a citizen of Florida, as it is a corporation formed in the State of Florida with its principal place of business at 14600 SW 136 St., Miami, Florida 33186.

6. Consequently, because the JV is a joint venture of Archer and de Moya, the JV is a citizen of Delaware, Illinois, and Florida.

7. The JV is informed and believes and thereon alleges that, at all relevant times herein, ACE was and is an entity formed and existing under the laws of the State of Pennsylvania, with its principal place of business at 436 Walnut Street, Philadelphia, Pennsylvania 19106.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) as there is complete diversity of citizenship between the parties because Plaintiff JV is a citizen of the States of Delaware, Illinois, and Florida and Defendant, ACE, is a citizen of the State of

Pennsylvania, and the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of $75,000.

9. This dispute arises from ACE's breach of an insurance contract that insures risk for a construction project located in Miami, Florida, including the risk of property damage giving rise to the Claim in dispute. Consequently, venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b) as a substantial part of the events and omissions giving rise to the claims that are the subject of this litigation occurred within this judicial district.

## FACTUAL ALLEGATIONS

10. The JV is the design-build contractor for the I-395/S.R. 836 Reconstruction/Rehabilitation Project in Miami, Florida, which includes construction of a signature bridge (the "Project").

11. ACE is an insurance carrier and, amongst other things, is engaged in the business of providing insurance policies to contractors and design-builders, including the JV.

## THE POLICY

12. Prior to commencing the Project, the JV sought quotes for builders risk insurance coverage through its insurance broker, Aon Risk Services Central Inc. ("Aon").

13. ACE provided a quote and, in reliance on the terms and representations presented with respect to the quote, the JV entered into an insurance contract with ACE for a "completed value builder's risk policy" bearing policy number I11153665 001 (the "Policy"), whereby ACE agreed to bear the risk of loss related to the Project pursuant to the terms of the Policy and in consideration of premiums paid by the JV.  A copy of the Policy is attached as **Exhibit 1.**

14. The JV is the named insured under the Policy.

15. ACE is obligated under the Policy's all-risk insuring agreement to pay for the JV for cost of replacing, repairing, rectifying, and/or making good all insured property at the Project that sustains loss or damage in any manner or cause whatsoever unless expressly excluded.

16. Specifically, the Policy states: "This Policy, subject to the terms, conditions and exclusions stated herein, or endorsed hereto, insures against all risk of direct physical loss or damage to [insured] property . . . ."

17. Insured property broadly encompasses *"property of every kind and description intended to become a permanent part of, or consumed in, the fabrication, assembly, installation, erection or alteration of the Insured Project*, as defined in the Declaration Page for which values have been declared and deposit premium paid" (emphasis added).

18. The JV's Claims for loss and damage to insured property, as outlined in greater detail in paragraphs 30 to 44 below, falls squarely within the scope of the Policy's insuring agreement and is not otherwise excluded by the Policy's terms, conditions, and/or exclusions.

19. In addition, the JV purchased an enhancement to the Policy's coverage to expand the scope of insurance to include loss and damage arising from defective work, design, and/or materials. The enhancement is designated in the Policy as Endorsement Number MS-61704, and its terms are commonly referred to in the insurance industry as "LEG 3" coverage.[1]

20. ACE quoted the Policy to include such LEG 3 coverage and, in its offering, ACE made the specific material representation to Aon and the JV that the LEG 3 coverage includes the cost of repairing defective work, design, and/or material, as well as the cost of repairing loss resulting from such defective work, design, and/or material. ACE charged additional premium for the LEG 3 endorsement and added a $100,000 deductible for the coverage afforded by the LEG 3 endorsement.

21. The JV relied on ACE's material representations in purchasing the LEG 3 endorsement and entering into the insurance contract.

22. The LEG 3 endorsement is both a coverage grant and an exclusion.

23. The LEG 3 endorsement starts by deleting the exclusions set forth in Policy form ACE 0219, Part D, Excluded Causes of Loss nos. 19 and 20, which would have otherwise barred coverage for loss or damage caused by "[e]rror, omission or deficiency in design, plans,

---

[1] "LEG" is an acronym for London Engineering Group, a consultative body of insurers of engineering class risks, which has developed various iterations of "LEG 3" (and other) coverage terms pertinent to first-party insurance risk for defective work, design and/or materials.

4

specifications, engineering or surveying," and "[f]aulty or defective workmanship, materials or supplies."

24. The LEG 3 endorsement then reinstates such coverage subject to a limited exception for project improvements.

25. Specifically, the LEG 3 endorsement states, "[t]his Policy does not insure any costs rendered necessary by defects of material, workmanship, design, plan, or specification and should damage occur to any portion of the Insured Property containing any of the said defects, the cost of replacement or rectification which is hereby excluded is that cost incurred to improve the original material, workmanship, design, plan or specification. For the purpose of this Policy and not merely this exclusion it is understood and agreed that any portion of the Insured Property shall not be regarded as damaged solely by virtue or the existence of any defect of material, workmanship, design, plan, or specification."

26. This language purports to exclude certain costs necessary to correct defective work, design, or materials, but then says that wherever such defects cause damage to the insured property, *the only excluded element is the cost to improve the original work, design, or materials*.

27. In sum, the LEG 3 endorsement grants coverage for loss and damage caused by defective design, work, and/or materials (including the cost to repair such defective design, work, and/or materials itself, as well as the cost to repair property damage resulting therefrom), but it excludes coverage for improvements to the original design, work, and/or materials.

28. In addition, the LEG 3 endorsement clarifies that coverage is not triggered solely by the existence of a defect of material, workmanship, design, plan, or specification.

29. The JV's Claim, as outlined in greater detail in paragraphs 30 to 44 below, does *not* seek costs to improve the Project's original work, design, and/or materials, *nor* does it seek coverage merely based on the existence of a defect; therefore, the JV's Claim does not fall within the limited scope of the LEG 3 endorsement's exclusionary terms.

## **THE CLAIM**

30. The Project included three main segments.

31. First, I-395 reconstruction, consisting of complete reconstruction of the elevated roadways from Midtown Interchange to MacArthur Causeway Bridge and creation of the "Signature" bridge over NE 2nd Avenue and Biscayne Boulevard.

32. Second, I-95 improvements, consisting of replacement of the concrete pavement for the northbound and southbound travel lanes near and around the interchange with S.R. 836 and I-395.

33. Third, S.R. 836 improvements include the construction of double deck (Viaduct) over the existing S.R. 836 east of the existing toll plaza at NW 17th avenue to Midtown Interchange.

34. In addition, the Project involved construction of a dry concrete batch plant at the Project site designed to produce concrete for construction of various parts of the Project (the "Plant").

35. All concrete produced at the Plant was intended to become a permanent part of, or consumed in, the fabrication, assembly, installation, erection and/or alteration of the Project.

36. The total cost of construction, the completed value of the Plant, and the Plant's concrete output were included in the estimated construction value for the purposes of establishing the limits and premium of the Policy.

37. As such, the concrete produced at the Plant was and is insured property under the Policy as defined in paragraph 17 above.

38. The Plant was constructed to include a pressurized fly ash silo and mechanical system designed to allow specified amounts of fly ash to be added to concrete batches.

39. The fly ash system included a pressure relief valve designed to prevent excessive pressure buildup inside the silo during operation.

40. Unbeknownst to the JV, the pressure relief valve failed at an unknown time between August 2020 and November 2020.

41. As a result, batches of concrete that were mixed at the Plant during that timeframe were adulterated by an excessive amount of fly ash due to the overpressure condition in the silo, thereby causing direct physical loss and damage to each such batch of concrete.

42. The impact of the excessive fly ash in the batches was reduced compressive strength and increased hardening time.

43. Before the defective valve was discovered, the Plant had produced numerous damaged concrete batches, which, in turn, were used to assemble various components of the Project, including roadway segments, piers, piles, footers, and seal slabs. Each of these Project components failed the 28-day compressive strength test.

44. The damaged batches also damaged adjacent (previously undamaged) concrete, forms, rebar, and other structural steel, which were encapsulated by the damaged batch concrete during construction. Repairs involved removal and destruction of these items, as well as modifications and strengthening in other areas.

45. Thus, as a result of the impaired pressure relief valve, the Project suffered physical loss and damage to insured property in several ways, including (1) damage to batches of concrete produced at the Plant, (2) loss in the compressive strength of various Project components, including roadway segments, piers, piles, footers, and seal slabs, and (3) damage to adjacent concrete, forms, rebar, and structural steel.

46. The cause of these losses was a component failure in the concrete Plant, not defective material, workmanship, or design.

## **THE COVERAGE DENIAL**

47. On March 25, 2021, the JV tendered the Claim arising from the aforementioned physical losses and damage to ACE.

48. In a letter dated May 13, 2021, ACE reserved its rights and commenced an investigation into the Claim. ACE identifies the Claim as claim no. KY21K2390058.

49. ACE's investigation involved an expert review by Halliwell Engineering ("Halliwell") who issued a report dated October 8, 2021.

7

50. Halliwell's report solely offered speculation about a fact that the JV does not dispute – that the concrete damage occurred at the Plant and not during transportation, placement, finishing or curing.

51. Seemingly based on that report, ACE issued a second letter dated November 18, 2021, in which ACE communicated a denial of all coverage.

52. On January 12, 2022, the JV sent a responsive letter, identifying the errors in ACE's coverage position and demanding that ACE reconsider its denial.

53. On February 25, 2022, after receiving no response from ACE to the JV's January 12, 2022 letter, the JV sent a follow-up letter, demanding a response thereto.

54. On February 28, 2022, ACE responded by letter reiterating its coverage denial.

55. To date, ACE has wrongfully and unreasonably refused to provide the JV with payment for covered losses and damages under the Policy.

56. As a foreseeable consequence of ACE's refusal to provide coverage for the JV's losses and damages under the Policy, the JV has and will continue to suffer harm.

## COUNT I
## BREACH OF CONTRACT

57. The JV repeats and realleges the allegations of paragraphs 1 through 54 as though fully set forth herein.

58. ACE, in consideration of premiums paid by the JV, duly executed and delivered to the JV the Policy – an insurance contract.

59. The JV provided timely and sufficient notice of the Claim.

60. The JV is, and at all relevant times was, in compliance with all conditions precedent for coverage under the terms of the Policy.

61. ACE is obligated pursuant to the terms of the Policy to pay for (among other things) the cost of replacing, repairing, and/or making good insured property at the Project that sustains loss or damage in any manner and by any cause whatsoever not expressly excluded, including the loss and damage giving rise to the subject Claim.

62. Despite demands, ACE unreasonably refused and/or otherwise failed to pay the JV for coverage benefits due and owing to the JV under the Policy terms.

63. ACE's refusal and/or failure to pay coverage benefits due and owing to the JV constitutes a breach of the Policy.

64. As a result of ACE's refusal to provide coverage, the JV has suffered damages and will continue to suffer damages in the future in excess of approximately $3 million in estimated loss associated with the Claim.

## COUNT II
## DECLARATORY JUDGEMENT

65. JV repeats and realleges the allegations of paragraphs 1 through 62 as though fully set forth herein.

66. A dispute has arisen between the JV and ACE regarding whether ACE is obligated to pay benefits to the JV for losses associated with the Claim, which are ongoing and continue to accrue.

67. An actual case and justiciable controversy exists regarding ACE's obligations under the Policy with respect to whether benefits associated with the Claim, including ongoing and accruing losses, are due and owing to the JV.

68. A declaratory judgment pursuant to 28 U.S.C. § 2201(a) is necessary and appropriate to determine the rights and duties of the JV and ACE pursuant to the Policy.

## PRAYER FOR RELIEF

WHEREFORE, the JV prays for judgment and the following relief against ACE:

1. Monetary damages associated with the Claim, including (but not limited to) all direct, actual, and consequential damages resulting from ACE's breach of the Policy and failure to pay coverage benefits due and owing thereunder;

2. A declaration that ACE is obligated to provide coverage for loss and damage associated with the Claim, including ongoing and accruing loss and damage.

3. Pre-judgment and post-judgment interest as permitted by law;

    4.    Attorneys' fees and costs, including (but not limited to) those available pursuant to Fla. Stat. § 627.428;

    5.    Such other legal and equitable relief that this Court deems just and proper.

## **JURY DEMAND**

WHEREFORE, the JV hereby demands a trial by jury for all claims herein for which a jury is permitted.

SAXE DOERNBERGER & VITA, P.C.

Dated: April 15, 2022

By: /s/ Holly A. Rice
Holly A. Rice, Esq. (Fla. Bar No. 89138)
999 Vanderbilt Beach Rd., Ste 603
Naples, Florida 34108
Tel: (239) 316-7244
hrice@sdvlaw.com
jwelch@sdvlaw.com
ckozdrey@sdvlaw.com

Attorneys for Plaintiff,
Archer Western – de Moya Joint Venture.