UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:22-CV-21160-GOODMAN
[CONSENT]

ARCHER WESTERN – DE MOYA
JOINT VENTURE

    Plaintiff,

v.

ACE AMERICAN INSURANCE CO.

    Defendants.
_____/

## ORDER ON DEFENDANT'S MOTION TO
## EXCLUDE TESTIMONY OF MAT RADLINSKI, PHD

In this breach of contract case, Ace American Insurance Company's ("Defendant" or "ACE") filed a motion pursuant to Federal Rules of Evidence 403, 702, and *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993) requesting to exclude expert testimony from Mat Radlinski's ("Dr. Radlinski"), who was retained by Plaintiff Archer Western - De Moya Joint Venture [ECF No. 103]. Plaintiff filed a response [ECF No. 104], and Defendant filed an optional reply [ECF No. 105].

Defendant's Motion mounts a multi-pronged attack on Dr. Radlinski. It demonstrates some soft and dicey parts of his opinions. Defendant's counsel will have a

substantial amount of legal ammunition to fire at Dr. Radlinski (though not at his credentials). But, for reasons outlined in greater detail below, the Undersigned **denies** the *Daubert[1]* motion to **exclude** him and his opinion testimony.

The challenges to his opinions are best addressed at trial, through vigorous cross-examination and the presentation of conflicting opinion testimony. To the extent that Defendant contends that Dr. Radlinski's opinions are based on inadequate or incorrect data, it can probe those perceived defects at trial and argue to the jury that his opinions should be rejected or significantly discounted.

I.   **Background**

Plaintiff is a design-build contractor, and Defendant is an insurance carrier who provides insurance policies to contractors and design builders like Plaintiff. [ECF No. 1].

Plaintiff filed this action based on the denial of its insurance claim. *Id*. The insurance coverage dispute concerns non-conforming concrete. In support of its suit, Plaintiff hired Dr. Radlinski as its Rule 26(a)(2) expert witness because he "specializes in concrete and cement-based materials and has extensive experience investigating problems associated with all aspects of concrete construction, including concrete material and performance failures." [ECF No. 104, p. 4].

Dr. Radlinski proffered thirteen opinions. Defendant argues that eleven of those thirteen opinions "are not based upon a scientifically valid inquiry, are irrelevant to a

---

[1]   *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993).

2

determination of the liability of ACE, will not aid the trier-of-fact, have limited probative value which is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, and are the subject of an overly vague expert report." [ECF No. 103, p. 2]. Defendant's *Daubert* motion seeks to exclude Dr. Radlinski's from opining on:

> 1. that petrographic examinations[1] indicated that the low compressive strengths and/or delayed hardening was due to high amounts of fly ash and low amounts of portland cement in the binder;
>
> 2. that the low compressive strengths and/or delayed hardening in the subject elements was not the result of non-compliant raw materials, weighing or batching errors, noncompliant fresh concrete/grout properties or concrete/grout placement, or consolidation or curing techniques utilized during construction of the subject elements;
>
> 3. that the incorporation of excessive amounts of fly ash occurred during batching at the dry batch plant;
>
> 4. that the combination of (1) the batch tickets for the subject elements indicating quantities of fly ash and cement consistent with the mix design and (2) significantly higher fly ash contents and significantly lower cement contents than the mix design as determined in the samples subjected to petrographic examinations suggests that a nominal quantity of cement batched at the dry batch plant consisted of partially cement and partially fly ash. Combined with the nominal amounts of fly ash per the mix designs, the subject concrete/grout contained significantly more fly ash and significantly less cement than per the mix design;
>
> 5. that the variability in compressive strengths and fly ash contents reported in the petrographic reports suggests that the degree of cement contamination by fly ash varied between and within the elements;
>
> 6. that the raw portland cement incorporated into the subject elements was damaged due to the apparent contamination by fly ash, which impaired the value and usefulness of the cement by compromising its strength gaining

capabilities associated with hydraulic cementitious properties, making it no longer fit for its intended use in concrete/grout;

7. that the incorporation of the damaged cement in concrete/grout batches placed in the subject elements had detrimental effect on their physical properties, including compressive strength and rate of hardening, due to altered composition and microstructure of the binder;

8. that the compromised concrete and grout batches containing portland cement contaminated with excessive amounts of fly ash were not fit for their intended use, and made recovery of embedded steel reinforcement and adjacent concrete/grout batches in those elements infeasible;

9. that incorporation of concrete/grout batches exhibiting low strength and delayed hardening due to integration of damaged cement into the subject elements had detrimental effects on their structural capacity and rendered them not fit for their intended use and as a result, those elements were rejected and replaced;

10. that the concrete seal slab at center pier did not act as a groundwater barrier, as intended, which was reportedly due to low concrete strength, and required dewatering the pier over a period of several months and subsequent repairs;

11. that since the concrete placed in Pier 4-12 footing (which was cast in the same timeframe as the subject elements) that it may have contained excessive amount of fly ash and insufficient amount of cement, the resulting delayed concrete hardening may have contributed to formwork failure during concrete placement due to increased lateral formwork pressure associated with the hydrostatic head of fluid concrete.

[ECF No. 103, pp. 3-5].

## II. Legal Framework

The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993).

Federal Rule of Evidence 702 governs the admission of expert testimony, as explained and refined by the United States Supreme Court in *Daubert*, 509 U.S. at 582 and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under this framework, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

> Rule 702 provides that:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

5

As an overarching principle, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. "In order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quoting *Daubert*, 509 U.S. at 590). There should be "[s]cientific method; good grounds and appropriate validation." *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005).

Reliability of the methodology requires "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method employed has a known rate of error; and (4) whether the technique is generally accepted in the scientific community. *Rink*, 400 F.3d at 1292; *see also Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

These reliability factors, however, are non-exhaustive. *Kumho Tire*, 526 U.S. at 150; *Rink*, 400 F.3d at 1292. Thus, "[i]n evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7. The burden of establishing the reliability of an expert's opinions rests on the proponent of that expert's

6

testimony. *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004). The party proffering the expert also has the burden of "laying the proper foundation for the admission of the expert testimony . . . and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341. Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

A less-than-perfect expert opinion may still be admitted, even if it contains gaps. *See In re Trasylol Prods. Liab. Litig.*, No. 08–MD–01928, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.").

Furthermore, courts "must be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *Id.* at *7 (quoting *Quiet Tech DC–8, Inc.*, 326 F.3d at 1341).

On the other hand, courts do not hesitate to exclude purported expert testimony which does not pass muster. *See Allison*, 184 F.3d 1300 (affirming summary judgment in

favor of silicone breast implant manufacturers and upholding district court's exclusion of proffered expert's causation testimony under *Daubert*); *Rink*, 400 F.3d at 1286 (affirming exclusion of expert testimony in products liability and toxic trespass claims against pesticide manufacturer and therefore affirming summary judgment for defendant); *Frazier*, 387 F.3d 1244 (finding trial court in criminal case did not abuse its discretion in excluding proffered expert testimony from forensic investigator); *Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010) (affirming defense summary judgment for infant car seat manufacturer in products liability lawsuit involving child who sustained traumatic brain injuries and upholding trial court ruling which excluded expert testimony because the experts were not sufficiently reliable).

**III.    Analysis**

Dr. Radlinski[2] works as a Principal Engineer with Exponent, an engineering and scientific consulting firm he has worked for since 2009. He specializes in concrete and cement-based materials. Dr. Radlinski's area of expertise includes analysis and optimization of concrete-mix design, characterization of chemical composition and physical properties of concrete, and evaluation of durability-related concrete failures including cracking, chemical attack, corrosion, and freeze-thaw damage. He is licensed

---

[2] A copy of Dr. Radlinski's expert report, including his qualifications, is filed in full on CM/ECF. [ECF No. 103-5]. The Undersigned's summary of Dr. Radlinski's background and opinions is derived from this exhibit.

in California as a Professional Civil Engineer, and has published more than twenty studies.

Plaintiff retained Dr. Radlinski to evaluate selected concrete/grout elements "which exhibited low strength and/or decay in hardening" and to "opine whether the materials used in [the selected concrete/grout] elements were damaged, and if yes, what resulting effects it had on those elements." [ECF No. 103-5, p. 8].

Defendant argues that (1) Dr. Radlinski's opinions are not based on sufficient facts or data; (2) Dr. Radlinski failed to employ reliable scientific principles or methods in forming his opinions; (3) Dr. Radlinski should be precluded from testifying about fly ash because he has no concrete batch expertise; and (4) Dr. Radlinski's opinions are inadmissible pursuant to Federal Rule of Evidence 403. [ECF No. 103]. However, Defendant explicitly states that its Motion "does not challenge [Dr.] Radlinski's qualifications as a concrete expert (but it does challenge his qualifications to testify about batch plants -- an area where he admittedly has no expertise)." *Id*., at 6.

Plaintiff argues that Defendant is "improperly asking the Court to weigh the evidence of the case." [ECF No. 104, p. 8]. "[Defendant's] argument wholly rests on its position that the supporting facts and data on which Dr. Radlinski relies are so 'woefully inadequate' that the methodology is unreliable." *Id* (quoting ECF No. 103, p. 3).

Defendant disagrees and states that it does not ask the Court to weigh the evidence. Instead, Defendant argues, its motion asserts that Dr. Radlinski's opinions are

9

"neither based on sufficient facts or data, nor the product of reliable principles and methods -- both express requirements of Federal Rule of Evidence 702." *Id*. Defendant then (essentially agreeing with Plaintiff's contention) argues that there is nothing for the Court to "weigh" because the opinions are "based upon insufficient evidence" and that the "methodology, or lack thereof, is equally unreliable, as it is virtually impossible for an expert to adhere to reliable principles and methods where the 'supporting' facts and data are so woefully inadequate." *Id*.

"As a general rule, the factual basis of an expert's opinion goes to the credibility or weight of the testimony rather than its admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005) (quotation and citation omitted). "[O]nly if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Id*.

Phrased differently in opinions from district courts in our Circuit, "it is not for the Court, on a *Daubert* motion, to determine the credibility and persuasiveness of [an expert's] opinions." *Goldberg v. Aon Risk Servs., Ne., Inc.*, No. 13-21653-CIV, 2018 WL 4479437, at *7 (S.D. Fla. Sept. 12, 2018). Nor is it appropriate for the Court to exclude otherwise admissible expert testimony on the basis that the opposing party disagrees with the facts or evidence considered. *Pods Enterprises, Inc. v. U-Haul Int'l, Inc.*, 2014 WL 2625297, at *3 (M.D. Fla. June 12, 2014) ("PEI also argues that Dr. Wood improperly

weighted the data, included improper questions, and failed to employ proper quality controls. These criticisms likewise go to the weight of her opinions, not their admissibility."); *Hersh v. Cavache, Inc.*, No. 17-14212-CIV, 2018 WL 6978638, at *2 (S.D. Fla. Aug. 23, 2018), *report and recommendation adopted sub nom*. *Hersh v. United States*, No. 17-14212-CIV, 2018 WL 6978628 (S.D. Fla. Dec. 7, 2018) (rejecting exclusion argument even though the expert reports were possibly "based on incomplete or wrong information").

Consequently, "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the **weight** of the evidence **rather than its admissibility**." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (internal quotation and citation omitted) (emphasis supplied); *see also Quiet Tech DC–8, Inc.*, 326 F.3d. at 1346 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.").

This principle is well settled throughout the country. *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 920 (8th Cir. 1986) ("Virtually all the inadequacies in the expert's testimony urged here by [the defendant] [-- that the expert's report was too small a sample of evidence --] were brought out forcefully at trial . . . . These matters go to the weight of the expert's testimony rather than to its admissibility."); *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (reversing district court's decision to exclude an expert's testimony as unreliable even though there was scientific literature which "cast doubt on [the expert's] position"); *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1345

11

(rejecting the argument that an expert should be excluded because "the specific numbers that [he] used were wrong").

Defendant argues that Dr. Radlinski's opinions are not based on sufficient facts or data because (1) he relied on "limited, cherry-picked data", (2) failed to sufficiently address conflicting or alternative opinions, and (3) ignored facts related to low strength concrete. [ECF No. 103, p. 9]. Defendant states that Dr. Radlinski's "opinions are based solely on a review of compressive strength and limited petrographic testing that [Plaintiff] performed well before the onset of this litigation, along with some photographs." *Id*.

But Defendant's description of what Dr. Radlinski's opinions are based on grossly oversimplifies and underrepresents the full extent of what was reviewed. In his declaration, Dr. Radlinski states that he "analyzed thousands of documents, which included: concrete batch tickets; field reports; mill certificates, data sheets and tests results for raw material; compressive strength tests reports; and petrographic examination of representative concrete samples." [ECF No. 104-11, ¶1]. Dr. Radlinski's declaration is consistent with his report. *See* ECF No. 105-1, pp. 20-21.

Defendant contends that Dr. Radlinski's opinions on the Project elements are "nothing more than a mere supposition" because not all of the elements were tested. [ECF No. 105, p. 3]. However, Dr. Radlinski cannot be expected to test something that does not exist. His report states that "[c]ast cylinder and core samples obtained from several

12

subject elements case between September 17 and November 3, 2020 were submitted for petrographic examination. . ." [ECF No. 104-23, p. 14]. Dr. Radlinski never had the chance to test the other elements because by the time Plaintiff retained him, the subject dry concrete batch plant was already sold and no longer available for inspection. [ECF No. 104-11, ¶19].

Notwithstanding the absence of the other elements, Dr. Radlinski was still able to make findings by reviewing a combination of evidence related to them. *Id*. ¶¶ 7-10. He based his conclusions on "engineering methodology that is consistent with common industry practice for similar forensic investigations." *Id*. ¶ 11. Additionally, Dr. Radlinski stated that

> No rule of thumb exists in the concrete construction industry as to the adequate number of representative samples for petrographic examination, as it depends on several factors including, but not limited to, the size of affected concrete elements, economic considerations, accessibility, overall variability of conditions or concrete properties in the affected concrete elements, and variability in the findings from petrographic examinations. The more consistent the findings from petrographic examinations of the samples examined, the fewer samples are generally necessary in order to form a reliable opinion regarding the underlying cause of the concrete condition (e.g., failure, low strength, deterioration) investigated.

[ECF No. 104-11, ¶ 13]. Therefore, Dr. Radlinski's inability to test *each* element does not bar his testimony, especially when he relied on what he deems to be reliable principles and methods. "Normally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore*, 478 U.S. at 400.

13

Defendant also takes issue with the fact that Dr. Radlinski did not "sample, test, or independently evaluate any Project element **himself**." *Id* (emphasis added). Defendant's issue incorrectly implies that Dr. Radlinski's opinion is weakened by his failure to personally evaluate the mentioned items himself. In determining the issue of causation, if "the basic methodology employed to reach the conclusions [is] reliable and sound" then the absence of Dr. Radlinski's personal involvement with the project elements "is not fatal." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1337 (11th Cir. 2010) (citing *Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741, 745 (11th Cir.1986)).

It is not improper for an expert to rely on information that he did not verify himself. *See BJ Tidwell Industries, Inc. v. Diversified Home Products, Inc.*, No. SA-06-CA-0264, 2007 WL 3118300, *2 (W.D. Tex., Oct. 19, 2007) ("It seems unreasonable to expect valuation experts to ascertain the accuracy of the financial information provided by their clients."; *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, No. 11-cv-01468, 2014 WL 983507, *6 (D. Colo. Mar. 13, 2014) (rejecting argument that expert's conclusions merely "parrot" the client's conclusions and holding that an expert's reliance on a client's spreadsheets and assumptions was not improper); *Guidance Endodontics, LLC v. Dentsply Int'l*, No. 07-cv-3302, 2009 WL 3672495, *11 (D.N.M. Sept. 29, 2009) (consulting financial expert need not "do an audit to verify each and every assumption" of the client). Therefore, Defendant's challenge is better suited for a jury. *See SolidFX*, 2014 WL 983507 (party can challenge expert's assumptions and the jury can assign whatever weight it deems appropriate).

14

Defendant additionally argues that Dr. Radlinski's report "flatly ignores" certain types of data and "any alternative theories for the cause of the low strength concrete." [ECF No. 103, pp. 11-12]. Defendant states that Dr. Radlinski ignored "the data demonstrating that [Plaintiff's] concrete problems continued after it purportedly 'fixed' the faulty pressure relieve valve, and also that its concrete problems extended to the 'wet' batch plant [.]" *Id*. Plaintiff disagreed and argued that Dr. Radlinski did not ignore that data because he compared the results from the "wet batch plant" with the "dry batch plant" in his report and "testified to the distinction of those test results in his deposition." [ECF No. 104, p. 17].

Defendant's argument here essentially boils down to its notion that Dr. Radlinski failed to consider an alternate theory as to how the concrete issues could be unrelated to "to the high fly ash content in the concrete produced at the dry batch plant." [ECF No. 105, p. 6]. The Undersigned is not convinced by the defense argument because, as Plaintiff states, Dr. Radlinski expressly said "there's zero evidence that the concrete produced by the wet batch plant was suffering from the same" issues as the dry batch plant. [ECF No. 104-2, 195:3-13].

Defendant argues that Dr. Radlinski failed to sufficiently address other conflicting or alternative opinions as to the cause of low strength concrete. [ECF No. 103, p. 12]. "An expert's consideration of alternative causes is generally relevant, but not dispositive, when assessing the reliability of their methodology." *Derose v. Scottsdale Ins. Co.*, No. 1:22-

CV-20784-KMM, 2022 WL 19829368, at *3 (S.D. Fla. Nov. 15, 2022) (citing *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.") (citations omitted).

Here, Plaintiff points out that Dr. Radlinski "specifically considered alternative theories for the cause of low strength concrete through extensive review and analysis of all project records[.]" [ECF No. 104, p. 14]. A review of his report supports Plaintiff's argument, specifically starting on page 20 with the following language, "The following project records further indicate that the low strengths and delayed hardening of concrete/grout in the subject elements **were not the result** of non-compliant raw materials, weighing or batching errors, or non-compliant fresh concrete/grout properties . . ." *Id*. (emphasis added). Dr. Radlinski then goes on to list and explain how the types of evidence support that finding. *Id*.

Even before that discussion, Dr. Radlinski starts the preceding paragraph with "[t]he existence of low strengths in the cylinders samples from the truck mixers and cured in laboratory conditions indicates that the low concrete/grout strengths **were not related to placement, consolidation or curing techniques utilized during construction of the subject elements**." *Id* (emphasis added). The Undersigned agrees with Plaintiff and notes that Defendant did not respond to Plaintiff's argument in its reply. *See* ECF No. 105.

Defendant subsequently argues that Dr. Radlinski should be precluded from testifying about how fly ash allegedly infiltrated the cement silo because he has no concrete batch plant expertise. [ECF No. 103, p. 18]. The Undersigned disagrees. In his declaration, Dr. Radlinski stated the following:

> 16. My expertise related to various aspects of concrete batch plant operations is based on my education, training, and professional experience. As part of my Ph.D. research at Purdue University, I visited several concrete batch plants in Indiana, where I observed concrete batch plant operations and personally performed concrete testing on trial and production concrete batches for bridge structures.
>
> 17. I have previously investigated other concrete-related losses and offered opinions concerning batch plants. Attached hereto as Exhibit B is a February 11, 2019 report that I authored for a third-party insurance adjuster involving fly ash that was accidently delivered and unloaded into a cement silo, resulting in the production of multiple concrete truckloads containing predominantly fly ash rather than portland cement.
>
> 18. During my nearly 15-year professional career at Exponent, Inc., I have conducted numerous investigations of failures or performance problems with concrete materials, many of which involved evaluation of various aspects of concrete batch plant operations including, but not limited to, storage, management, handling and testing of raw materials; concrete batching, mixing and transportation; generation of concrete batch tickets; and quality control.

[ECF No. 104-11, ¶¶ 16-18]. Additionally, in his deposition he said,

> Q  And would it be correct to say that you're an expert in terms of, you know, the chemical composition of various forms of concrete?
>
> A  Yes. I -- I think that's -- that's a fair statement.
>
> Q  Okay. Would you consider yourself an expert, sir, in the operations of a dry concrete batch plant, you know, leading up to the point where you have a concrete mix?

17

>A  I'm not sure if I would characterize myself as a -- as a dry concrete batch plant expert. I am certainly familiar with aspects of dry batch plants or any batch plant operation, but **I'm not sure if that --that would meet your -- your standard for or definition of -- for an expert.**

[ECF No. 104-2, 17:2-16 (emphasis added)].

Defendant cites the deposition except above and states that Dr. Radlinski, "does not hold himself out as a concrete batch plant expert and does not offer any opinions in his report related to how the fly ash allegedly mixed with the cement." [ECF No. 103, p. 18]. Plaintiff argues that Defendant mischaracterizes Dr. Radlinski's deposition testimony as proof that he is not an expert within that field when in reality he was skeptical of Defendant's terminology. [ECF No. 104, p. 21]. Defendant did not respond to Plaintiff's argument in its reply. The Undersigned agrees with Plaintiff. Based on Dr. Radlinski's experience and expertise, he is qualified to opine as an expert here.

Finally, Defendant's Rule 403 arguments as to Dr. Radlinski's opinions are unconvincing. Defendant argues that "without some theory as to causation," Dr. Radlinski can only opine as to two of the eighteen claims elements. But Dr. Radlinski was retained to "opine whether the materials used in the subject elements were damaged, and if yes, what resulting effects it had on those elements." [ECF No. 104-12, p. 1]. Causation is not necessarily included within that analysis. This argument is also unavailing because Defendant does not include any supporting authority in its Motion illustrating *why* Dr. Radlinski needs to opine on causation (even though he was not retained to do so) and

how that influences his current opinions. "We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

However, Defendant's reply includes multiple arguments related to Florida law and Plaintiff's burden of proving causation that were absent from Defendant's Motion. As a result, the Court will not address these arguments because they are not properly before this Court since they were made for the first time in the reply. *Silberman v. Miami Dade Transit*, 927 F.3d 1123, n. 6 (11th Cir. 2019) (noting that defendant did not "have an opportunity to respond to either of [plaintiff's] newly-raised theories of liability" and declining to address arguments raised for the first time in a reply); *see also United States v. Evans*, 473 F.3d 1115, 1120 (11th Cir. 2006) ([A]rguments raised for the first time in a reply brief are not properly before a reviewing court."); *United States v. Rodriguez*, 805 F. App'x 773, 776, n.4 (11th Cir. 2020) ("Because he raised the issue in a perfunctory manner in his initial brief without supporting arguments or authority, he abandoned it.").

All in all, Defendant's objections to Dr. Radlinski's opinions are misplaced because they are better suited for cross examination. Defendant's criticisms as to the data he relied on and the theories he considered go to the weight of his opinion, not its admissibility. *See Pods Enterprises, Inc.*, 2014 WL 2625297, at *3 ("PEI also argues that Dr. Wood improperly weighted the data, included improper questions, and failed to employ proper

19

quality controls. These criticisms likewise go to the weight of her opinions, not their admissibility."); *Hersh*, 2018 WL 6978638, at *2 (rejecting exclusion argument even though the expert reports were possibly "based on incomplete or wrong information").

Therefore, the Undersigned **denies** Defendant's Motion to Exclude Plaintiff's expert testimony The challenges to his opinions are best addressed at trial, through vigorous cross-examination and the presentation of conflicting opinion testimony. Defendant will be able to challenge those opinions at trial and to ask the jury to accept the challenges and reject or discount Dr. Radlinski's opinions.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on December 19, 2023.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All Counsel of Record