UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:22-CV-21160-GOODMAN
[CONSENT]

ARCHER WESTERN – DE MOYA
JOINT VENTURE

       Plaintiff,

v.

ACE AMERICAN INSURANCE CO.

       Defendants.

_____/

ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

      This case concerns sub-par concrete. From an overarching view, the issue is whether an insured constructing a highway reconstruction project successfully built a viable legal road to insurance coverage when the concrete it created from cement (and other materials) was defective *or* whether its efforts to obtain coverage are a bridge too far.

      More specifically, this breach-of-contract case involves a builder's all-risk insurance policy issued by Defendant Ace American Insurance Company ("Defendant", "ACE", or "Chubb"). ACE filed a summary judgment motion [ECF No. 88] concerning the insured's claim for the cost to perform work on bridge components constructed

with inadequate concrete (which supposedly failed to meet project specifications). Plaintiff Archer Western-De Moya Joint Venture ("Plaintiff" or "the JV") filed a response [ECF No. 92], and ACE filed an optional reply [ECF No. 100].

ACE describes the work the JV performed in response to its discovery of the concrete failure as efforts to *improve* the bridge components, while Plaintiff stridently says it is not seeking costs incurred to improve the Project's original work, design and/or materials. Instead, the JV contends its efforts were solely to *repair* the damage. This distinction is critical, as a policy provision grants coverage for costs incurred to repair certain damaged, covered property but excludes coverage for improvements to the covered property.

At bottom, the low-strength concrete used in the construction project caused the JV to strengthen or re-pour the concrete. But ACE says defective initial construction does not qualify as "direct physical loss or damage," which is required to trigger coverage under the insurance policy. Plaintiff disagrees, citing caselaw involving insurance coverage disputes concerning contaminated products.

In addition, the improvement/repair distinction in the policy is an especially thorny issue here, where the initial concrete was defective from the start. Given that reality, it could be argued that *any* work done to shore up the concrete and other components would constitute an *improvement* (unless Plaintiff decided to use equally defective or even-worse-quality cement in its remediation efforts, and there is no

evidence of that bizarre hypothetical scenario in this record). On the other hand, it certainly is logical to conclude that the only reasonable way to "repair" portions of the project plagued by defective concrete would necessarily *result* in an improvement to the repaired areas -- even if improvement were not the goal. Framed by this inevitable paradox, the JV contends that the policy language is ambiguous, which, under Florida insurance policy interpretation law, means that the language is construed *against* ACE (and in favor of coverage).

As outlined below, the JV has also proffered another argument in an effort to avoid an adverse summary judgment in ACE's favor: that the cement and fly ash used to create concrete are distinct properties which were in a satisfactory and undamaged state before they were mixed together to form the defective concrete.

ACE relies on a series of insurance coverage cases involving COVID-19, where courts applying Florida law concluded that coverage was unavailable because there was no direct, physical, tangible alteration to the insured property. But the JV argues that those cases are inapposite, and it cites to a recent federal district court case involving a similar policy and its application to a bridge construction project. In that case, the Court denied the carrier's summary judgment motion and granted the insured's summary judgment motion on coverage, finding the COVID-19 cases to be unpersuasive because "[t]o state the obvious, none of these cases are similar to the facts here" as "none of these cases involved construction, bridges, workmanship defects of

anything of the sort." *S. Capitol Bridgebuilders v. Lexington Ins. Co.*, No. 21-cv-1436, 2023 WL 6388974, at *7 (D.D.C. Sept. 29, 2023) ("*SCB*").

In addition, as we will soon learn, there are still factual disputes concerning the issue of whether excessive fly ash damaged the bulk of the cement mix. Moreover, ACE's presentation of some facts surrounding the deposition testimony of Plaintiff's expert is incomplete, and, therefore, incorrect.

Furthermore, the Court concludes that the language concerning costs to "improve" the original materials and workmanship is subject to more than one interpretation here. That means the language is **ambiguous**. And *that* means that Florida law requires the language to be construed against the drafter (i.e., ACE) and in favor of coverage. And ***that*** means that the Undersigned cannot grant ACE's summary judgment motion.

One final point by way of introduction: the record is still murky on factual issues underlying ACE's alternative ground for summary judgment (i.e., that Plaintiff provided late notice of the loss). This argument, if applicable, then triggers Plaintiff's burden to show that the delay was not prejudicial to ACE, which contends it was prevented from adequately evaluating the claim because the JV had already finished remediation work and had removed physical evidence of the concrete elements which had to be discarded and repoured). These factual disputes preclude a summary

judgment ruling in ACE's favor on its late notice theory, which it can still advance at trial.

For these reasons (and others outlined in greater detail below), the Undersigned **denies** ACE's summary judgment motion.[1]

## PROCEDURAL HISTORY

This case is a first-party insurance coverage dispute between Plaintiff and its insurer concerning $3,635,621.97 in payments withheld under a builder's risk policy (the "Policy"), in addition to sums that allegedly remain unadjusted based on Defendant's coverage denial. Plaintiff's insurance claim is for the cost to repair (or improve, depending on which party's perspective is adopted) bridge components constructed with low-strength concrete. The at-issue bridge components consisted of elements of Plaintiff's I-395/S.R. 836 Reconstruction/Rehabilitation Project in Miami, Florida. The concrete in the at-issue bridge components did not meet project specifications. Before this concrete was poured, Plaintiff had taken out the Policy with Defendant. Plaintiff made a claim under the Policy for the costs associated with replacing/repairing the defective concrete. Defendant denied Plaintiff's claim in its entirety.

The parties disagree about whether the Policy covers the cost to rectify (or improve) the defective concrete. Interpreting an insurance policy contract and deciding if there is coverage for a claim is a legal issue which a Court decides, usually in the form

---

[1]     Plaintiff did not file its own summary judgment motion (to, for example, obtain declaratory relief that the policy *does* provide coverage).

of a summary judgment ruling, if the facts are not in dispute. But some of the critical facts are in dispute and some of the language is ambiguous.

## FACTUAL BACKGROUND

Defendant submitted an initial statement of material facts [ECF No. 87, with 49 numbered paragraphs]. Plaintiff filed a response [ECF No. 94], with additional facts designated as paragraphs 50–89, and Defendant filed a reply to the JV's additional facts. [ECF No. 101].

### Introductory Remarks About the "Facts"

The facts are generated from the paragraphs in the statement of facts (and statement of additional facts) or responses to the statements of facts which the opposing party expressly agreed are undisputed. For those purported facts which the opposing party classified as *partly* disputed, the Undersigned includes only the *undisputed* portions. At times, an undisputed fact is supplemented with a portion of the response in order to place the fact in context and provide a fuller understanding of the specific fact.

The Undersigned sometimes changed the wording of an undisputed fact for stylistic and/or grammatical purposes. In addition, to enhance readability, I removed the specific record citations. They can be found in the source document, if needed.

If a party argued that a purported fact is disputed but did not provide record evidence to support the contention, then I deemed the fact to be *undisputed* if otherwise supported by record evidence. Therefore, to provide one example, a party could not

successfully claim that a fact was actually disputed by relying solely on a hearsay-only declaration submitted by an attorney who lacks personal knowledge.

Likewise, if a party argued that a purported fact was disputed but provided record evidence which actually did *not* establish the argument that a fact is disputed, then I deemed the fact to be *undisputed.* This scenario could occur when, to provide one illustration, a party cited to pages of a deposition transcript which did not contain the testimony relied upon by the party.

I also ignored disputes that are not actual factual **disputes**. Adding an *additional, but not contrary*, fact, does not generate a bona fide factual dispute. Instead, the new fact is merely an additional fact which the opposing party is permitted to include in its own statement of additional facts if it believes it to be material.

This type of **non**-dispute is illustrated by the following hypothetical: A defendant submits a statement of facts which contends through record evidence citations that a traffic light was green for defendant at the time of the vehicle collision at issue, and the plaintiff's response claims that this fact is **disputed** because it was raining at the time of the collision. The fact of rain does not create a factual dispute about the traffic light's status. Instead, it is simply an additional fact which a plaintiff can place in his own statement of additional facts.

This analogy applies even if the party opposing the summary judgment motion offered several additional facts to (unsuccessfully) support the notion that the

undisputed fact is actually disputed. Thus, if the hypothetical affidavit mentioned above also explained that it was storming, the visibility was poor, the radio was on loud, it was dusk, the driver was changing stations on the car radio, the windshield wipers were inoperable and the plaintiff was speeding, none of these additional facts would cause the undisputed fact that the light was green for the defendant driver to somehow be deemed a disputed fact.

By including a fact as undisputed, the Undersigned is not *necessarily* finding that the fact is legally relevant and admissible. Rather, the listing of a fact simply means that it is undisputed. The Undersigned may, in the analysis section, choose to label a fact as irrelevant or to ignore it because it was immaterial. However, the Undersigned sometimes decided to omit a purported fact if it is clearly immaterial and inadmissible, or if it lacked a necessary factual foundation or predicate. When the Undersigned reached these conclusions, the reference "N/A" would also be used if there were no other facts which could fairly be classified as undisputed.

Likewise, interposing a legal objection (such as "not relevant" or "unfairly prejudicial") does not by itself create a factual dispute. If the legal objection is meritorious, then it would cause me to not consider an undisputed fact, but it does not create a factual *dispute*. And if the legal objection is unconvincing and there are no evidence-based, citation-supported grounds demonstrating the existence of a bona fide

factual dispute, then the undisputed fact is fair game for my summary judgment motion assessment.

Framed by these rules, the following facts are undisputed unless otherwise noted. The numbered paragraphs correspond to the numbered paragraphs in Defendant's Statement of Material Facts and Plaintiff's Statement of Additional Material Facts. [ECF Nos. 87; 94]. If a purported fact was appropriately disputed, then the term "N/A" is listed next to the paragraph number.

After listing the Facts from the Defendant's Statement of Material Facts [ECF No. 87], I then list Plaintiff's additional facts filed in response to Defendant's Statement of Material Facts. [ECF No. 94].

<u>Defendant's Statement of Material Facts</u>

1. Plaintiff is a joint venture comprised of two entities, Archer Western Contractors, LLC and The de Moya Group, Inc.

2. Plaintiff is the design-build contractor for the I-395/S.R. 836 Reconstruction/Rehabilitation Project in Miami, Florida, which includes construction of a signature bridge (the "Project").

***The Policy***

3. Defendant issued a completed value builder's risk policy (the "Policy"), bearing policy number I11153665 001, to Plaintiff.

4. The Policy was in effect for the length of the Project from January 1, 2019 – January 21, 2023.

5. The Policy provides in the Insuring Agreement:

*PART A*
*INSURING AGREEMENT*

This Policy, subject to the terms, conditions and exclusions stated herein, or endorsed hereto, insures against all risk of **direct physical loss or damage** to property of <u>**every kind and description**</u> **intended to become a permanent part of, or consumed in, the fabrication, assembly, installation, erection or alteration** of the Insured Project, as defined in the Declaration Page for which values have been declared and deposit premium paid.

(emphasis added).

6. The Policy provides in the Exclusions:

*PART D*
*EXCLUSIONS*

\* \* \*

<u>EXCLUDED CAUSES OF LOSS</u>

This policy does **not insure** loss or damage caused directly or indirectly by any of the following, and such loss or damage is excluded regardless of any other cause or event that contributes concurrently, or in sequence to the loss:

\* \* \*

THIS POLICY DOES **NOT** INSURE LOSS OR DAMAGE CAUSED BY ANY OF THE FOLLOWING, **UNLESS** DIRECT **PHYSICAL LOSS OR DAMAGE** BY AN INSURED CAUSE OF LOSS ENSUES AND THEN THIS POLICY INSURES **ONLY** SUCH ENSUING DIRECT **PHYSICAL LOSS OR DAMAGE**.

* * *

20. Faulty or defective workmanship, materials or supplies.

(emphasis supplied)

7. The Policy provides in the General Conditions:

*PART F*
*GENERAL CONDITIONS*

<u>16. IN CASE OF LOSS</u>

<u>*A.   Notice of OCCURRENCE:*</u>
The (Insured's risk management department) will, **as soon as practicable**, report in writing to the Company every OCCURRENCE that may give rise to a claim under this Policy.

<u>*B.   Proof of Loss:*</u>
The Insured will as soon as practicable, file with the Company a signed and sworn detailed proof of loss.

<u>*C.   Payment of Loss*</u>
All adjusted claims will be due and payable no later than (thirty) days after presentation and acceptance of proof of loss by this Company or its appointed representative.

(emphasis added).

8.   The Policy also contained the following endorsement:

<u>*Endorsement MS-61704 Excluded Causes of Loss*</u>

This endorsement and the coverage it provides applies only to the following Insureds:

Archer Western – DeMoya Joint Venture LLC

Any other Insured, if one of the entities listed above informs the Company before or after a loss, by written request that this endorsement and it's coverage should apply to that Insured.

The following changes are made to ACE 0219, Part D, Excluded Causes of Loss, [paragraphs] 19 and 20 are **deleted and replaced** by the following:

This Policy does not insure any costs rendered necessary by **defects of material, workmanship**, design, plan, or specification and should damage occur to any portion of the Insured Property containing any of the said defects, the cost of replacement or rectification which is hereby **excluded** is that cost incurred to **improve** the original material, workmanship, design, plan or specification.

For the purpose of this policy and not merely this exclusion it is understood and agreed that any portion of the Insured Property **shall not be regarded as damaged <u>solely</u> by virtue or the existence of any defect of material, workmanship, design**, plan, or specification.

The deductible applicable to this coverage is $100,000.[2]

(emphasis added).

### *<u>The Project and Concrete at Issue</u>*

9.   The Project included three main segments.

10.  First, I-395 reconstruction, consisting of complete reconstruction of the elevated roadways from Midtown Interchange to MacArthur Causeway Bridge and creation of the "Signature" bridge over NE 2nd Avenue and Biscayne Boulevard.

---

[2]      The deductible was later changed to $250,000.

12

11. Second, I-95 improvements, consisting of replacement of the concrete pavement for the northbound and southbound travel lanes near and around the interchange with S.R. 836 and I-395.

12. Third, S.R. 836 improvements include the construction of double deck (Viaduct) over the existing S.R. 836 east of the existing toll plaza at NW 17th Avenue to Midtown Interchange.

13. In addition, the Project involved construction of a dry concrete batch plant at the Project site designed to produce concrete for construction of various parts of the Project (the "Plant").

14. Concrete used for the Project is primarily being produced and supplied by Plaintiff from two different on-site batch plants it owned and operated: Batch Plant No. 1 (FDOT No. 87-554), a dry batch plant in which the dry constituent materials and water are discharged directly into a mixing truck, and Batch Plant No. 2 (FDOT No. 87-564), a central mix batch plant, in which the dry constituent materials and water are charged into a mixer at the plant and the mixture is discharged into the mixing trucks.

*__The Claim__*

15. The matter involves batches of concrete that were reportedly mixed with excessive amounts of fly ash from Batch Plant No. 1 (No. 87-554).

16. The Plant was constructed to include a pressurized fly ash silo and mechanical system designed to allow specified amounts of fly ash to be added to concrete batches.

17. The fly ash system included a pressure relief valve designed to prevent excessive pressure buildup inside the silo during operation.

18. Plaintiff alleges the pressure relief valve failed at an unknown time between August 2020 and November 2020.

19. At the request of the Florida Department of Transportation (FDOT), during the 9-day period commencing on November 2, 2020, the production of concrete from Batch Plant No. 1 was stopped.

20. Plaintiff alleges as a result, batches of concrete that were mixed at the Plant during that timeframe were adulterated by an excessive amount of fly ash due to the overpressure condition in the silo.

21. Plaintiff alleges that the impact of the excessive fly ash in the batches was reduced compressive strength and increased hardening time.

22. N/A.

23. Plaintiff's risk management department was aware of the low strength concrete issue no later than November 2020.

24. However, Plaintiff did not immediately report the low strength concrete claim to Defendant. It was not until March 25, 2021, that Plaintiff notified Defendant that certain bridge elements had to be improved or rectified because of low strength concrete.

25. N/A.

26. N/A.

27. N/A.

28. N/A.

29.  Plaintiff's Project Director, Rami Nassar, has no first-hand knowledge of a clog, never saw a clog, and never retained any physical evidence of a clog.

30.  In fact, Mr. Nassar testified that he has no personal knowledge of either the clog or this alleged sequence of events; it was all reported to him by others.

31.  The clog was identified by Plant Manager, Reginald Brown, who reportedly cleared the clogged pipe by poking it with a piece of rebar – an effort that according to Mr. Nassar "took a few minutes."

32.  Mr. Nassar testified that there was an accumulation of a cementitious material over time in a pipe, which was corrected by going in and poking it down so as to open up the pipe so the pipe was breathing again and the valve was working.

33.  N/A.

34.  Mr. Nassar testified "Once you unplug the pipe the valve will work again."

35.  Mr. Nassar testified that this Project had issues with low-strength concrete before and after the valve was "repaired."

36.  N/A.

37.  Dr. Mat Radlinski, Plaintiff's concrete construction expert, confirmed that fly ash does not "damage" individual cement particles (i.e., it does not chemically or physically alter individual cement particles). [However, in a portion not flagged by ACE, he also

testified that the bulk of the cement mix was damaged because of contamination with excess volumes of fly ash.].

38.  N/A.

39.  N/A.

40.  It is important to understand that the terms "concrete" and "cement" are often used interchangeably, but they are not synonymous. Instead, "concrete" is a final product, where "cement" is just one ingredient in concrete. Other common ingredients include fly ash, water, and aggregates.

41.  From a technical perspective, portland cement paste (portland cement + water) serves as the glue to bind the aggregates together into concrete.

42.  The amount of cement used directly influences the compressive strength of concrete. If less cement is used for a given mixture, it should be expected that the resulting compressive strength of the concrete will be less.

43.  The constituents of concrete and the proportions of those constituents control the compressive strengths achieved by any particular concrete mixture.

44.  Fly ash is one commonly used concrete constituent. As is the case for any constituent, fly ash does influence concrete compressive strength. Indeed, the addition of fly ash to a concrete mixture generally increases the overall compressive strength of the concrete when that addition does not involve any reduction to the quantity of cement in the mixture.

45.  The mixture designs for the subject concrete Project elements called for a portion of the cement to be replaced with fly ash, meaning that the fly ash in the mixture was actually intended to substitute in place of some cement.

46.  When a portion of cement is replaced with fly ash, the resulting concrete would typically achieve lower 28-day compressive strength than if the mixture were made without substituting fly ash for a portion of the cement.

47.  If the concrete mixture proportions are further adjusted (either intentionally or unintentionally) by replacing yet more of the cement with fly ash, the resulting compressive strength characteristics of the concrete are simply different because the original mixture design was not followed.

48.  N/A.

49.  Lower-than-expected concrete compressive strength may be the result of multiple factors, but three of the most influential factors on concrete compressive strength are the total air volume, water content, and the cementitious materials content.

<u>Plaintiff's Additional Facts</u>

50. Defendant is an insurance carrier engaged, in part, in the business of providing insurance policies to contractors and design-builders, including Plaintiff.

51. Under the Policy's insuring agreement, Defendant is obligated to pay Plaintiff for the costs of replacing, repairing, rectifying, and/or making good all insured

property at the Project that sustains loss or damage in any manner or cause whatsoever unless excluded.

52. Policy Endorsement Number MS-61704 ("LEG 3 Extension"), adjusted the coverage available under the Policy to **include** types of loss and damage arising from defective work, design, and/or materials (but it still excludes coverage for *improving* defective materials and workmanship).

53. The LEG 3 Extension is both a coverage grant and an exclusion.

54. Defendant charged a $250,000 deductible for coverage under the LEG 3 Extension.

55. N/A.

56. The dry concrete batch plant (the "Plant") was comprised of separate silos, one containing cement mix, and another containing fly ash.

57. N/A.

58. N/A.

59. The cement mix and fly ash were combined at the Plant pursuant to a set ratio, which then would later be combined with water to produce concrete used to construct various structural components of the Project.

60. Plaintiff claims that sometime between August 2020 and November 2020, the Plant's pressure relief valve system failed, but ACE contends that the only witness to testify about this said he had no personal knowledge of it.

61. Plaintiff claims that, due to the Plant's pressure relief valve system failure, the fly ash silo became over pressurized and forced excess fly ash into the raw cement silo, thereby contaminating the otherwise satisfactory raw cement. But ACE argues that the only witness to testify about this said he had no personal knowledge of it.

62. The contaminated cement mix and excess fly ash was then combined with water to produce concrete batches while being transported to various pour sites throughout the Project.

63. N/A.

64. The at-issue concrete was then poured into various Project components including roadway segments, piers, piles, footings, and seal slabs, which failed to meet the required 28-day compressive strength test.

65. N/A.

66. N/A.

67. Several concrete batches and Project components were below standard before the issue and scope of associated damage was discovered.

68. N/A.

69. On October 2, 2020, Plaintiff tendered notice of a claim initially consisting of damage to formwork and excavation at Pier 4-12 of the I-395 highway infrastructure (the "Formwork Loss").

70. The Formwork Loss manifested when the formwork collapsed (the JV describes it as buckling) during a concrete pour for Pier 4-12's footing.

71. On October 27, 2020, Defendant conducted a site investigation for the formwork failure and Defendant observed the subject concrete being chipped away and removed, but, instead of collecting samples of the subject concrete, Defendant observed only the Project site, photographs, Project documents, and interviewed the Project team.

72. At the time of the Formwork Loss, ACE was unaware that Plaintiff would later be making a claim for defective concrete in Project elements.

73. On March 25, 2021, Plaintiff sent Defendant a notice after becoming aware of the problem with inadequate cement and the scope of associated damage.

74. On April 15, 2021, Defendant included in its claim file the foregoing notice and further noted that (1) Plaintiff still had the Plant's valve, and (2) a site inspection was being coordinated for April 23, 2021.

75. On April 23, 2021, Defendant's representatives performed a second site visit at the Project; however, Defendant did not collect samples of the concrete but rather observed only the Project site, photographs, Project documents, and interviewed the Project team. ACE contends it never had the opportunity to inspect Project elements because they had been discarded, along with relevant samples.

76. On May 13, 2021, Defendant issued a reservation of rights letter, noting that it would commence further investigation, and advising that Defendant would be setting up a new claim file for the losses associated with Plaintiff's supplemental tender.

77. On June 7, 2021, Plaintiff responded, reiterating to Defendant its view that this was a single claim, as the cause and ensuing loss all arise from the same valve system failure and contaminated concrete batches.

78. Lei Haung, who works with Chubb, reviewed Plaintiff's losses and opined: "This is LEG 3 language (we cover ensuing damages and the defective portion itself, however we do not pay any improvement costs to fix the defect)."

79. David Trippel, a Chubb assistant vice president for executive claim management, testified that in reference to the formwork collapse, rebar, which has to be chipped out and replaced, constitutes physical damage under the Policy (for the formwork claim).

80. N/A.

81. Defendant granted coverage for the Formwork Loss. ACE's letter advised as follows: "This is to advise you that because the cause of loss has been preliminarily attributed to faulty design and workmanship the costs associated with improving the original form design, workmanship, or material are **excluded from coverage**. The reasonable costs associated with removing the hardened concrete from the original pour, **repouring** the concrete, **repairing/replacing** damaged forms, and **reinstalling**

the forms in the design that existed on the date of loss will be covered subject to the $250,000 deductible." (emphasis added).

82. Defendant denied coverage for the Loss at issue here, reasoning the concrete constituted a **defective material** due to the excess fly ash, and "[b]ecause of this defect the material was never in a satisfactory state and therefore was not damaged."

83. Defendant cited the Policy's insuring agreement and the LEG 3 Extension in both of its Formwork Loss and Loss coverage letters.

84. Dr. Radlinski testified that the contamination of the cement mix with excess fly ash did not alter the chemical or physical alteration of "the individual microscopic-sized particles" themselves, but rather the bulk of the cement mix was damaged by virtue of contamination with large volumes of fly ash.

85. Dr. Radlinski testified that in his opinion, the excess fly ash got into the Project components during the batching process.

86. Dr. Radlinski explored other potential causes of the concrete's weakened strength and did not find any evidence or data suggesting anything other than excess fly ash was the cause of the weakened concrete. However, he conceded that his conclusions (about how excessive amounts of fly ash and insufficient amounts of cement ended up in concrete batches) were inconclusive.

87. The Project records indicated to Dr. Radlinski, who conducted only a limited investigation, that low strength and delayed hardening of the concrete in the Project

elements was not the result of non-compliant raw materials, weighing or batching errors, or non-compliant fresh concrete properties.

88. The root cause of the subject concrete's low compressive strength remains in dispute.

89. Plaintiff's primary scope of work as a civil contractor and bridge builder includes mass concrete production and development. Concrete production is precisely the scope of work Plaintiff insures when procuring its insurance policies from Defendant and other insurers (for constructing an asset in development, such as the Project).

<u>Additional Undisputed Material Facts</u>[3]

90. The Policy does not define "direct physical loss or damage."

91. The Policy does not define "improve" (as used in the exclusion for "cost incurred to improve the original material").

92. The Policy does not require that the property be in an initial satisfactory state.

93. Dr. Radlinski provided the following opinions in the "Damage" section of his written report:

> The accidental incorporation of excessive amounts of fly ash and insufficient amounts of portland cement relative to mix design quantities in the concrete/grout batches placed in the subject elements had

---

[3]      These additional points are in the record and the Undersigned deems them significant enough to mention them here, even though the Parties did not expressly quote them in their respective page-limited Statements of Fact.

**detrimental effect on their physical properties including compressive strength** (Table 1) and rate of hardening (Figure 8) due to **altered composition and microstructure of the binder** (as indicated by the AET petrographic reports and illustrated in Figure 11, Figure 13 and Figure 14). The compromised concrete and grout batches containing damaged portland cement were not fit for their intended use. In addition, placement of these concrete/grout batches into the subject elements made the reuse of embedded steel reinforcement and adjacent concrete/grout batches that may not have been affected by the low strength and/or delayed hardening (e.g., Figure 4 through Figure 7) **infeasible.**

\* \* \*

The subject elements were rejected because they contained concrete/grout that exhibited inadequate strength gain and failed to meet the specified compressive strength, rendering them **structurally inadequate.** Therefore, the replacement of compromised precast segments and addition of replacement piles with structurally adequate concrete/grout meeting the specified strength was **necessary** to comply with the original structural design, and was **not an improvement**.

[ECF No. 94-2, pp. 24–25 (emphasis supplied)].[4]

## LEGAL STANDARD AND ANALYSIS

### Summary Judgment (in General)

Federal Rule of Civil Procedure 56 provides, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to judgment as a matter of law.'" *See Alabama v. N. Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). The existence of some factual disputes between litigants will not defeat an otherwise properly grounded motion for summary

---

[4]     ACE filed a *Daubert* motion [ECF No. 103] to exclude his expert opinion testimony, but the Undersigned denied it [ECF No. 110], concluding that the challenges are best left to cross-examination at trial.

judgment; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251. The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992).

If the moving party meets its legal obligation, then the burden shifts to the non-moving party to rebut that showing with admissible evidence to demonstrate a genuine issue of material fact. *Josendis v. Wall to Wall Residence Repairs, Inc.,* 662 F.3d 1292, 1314 (11th Cir. 2011). When deciding whether summary judgment is appropriate, the court views all facts and resolves all doubts in favor of the nonmoving party. *Feliciano v. City of Miami Beach,* 707 F.3d 1244, 1247 (11th Cir. 2013).

However, "if the non-movant's response consists of nothing 'more than a repetition of his conclusional allegations,' summary judgment is not only proper, but required." *Bentley Motors Corp.*, 976 F. Supp. 2d 1297, 1309 (M.D. Fla. 2013) (citing *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981)).

Even if the parties do not dispute the actual fact, disputes over the inferences that should be drawn from the fact can still preclude summary judgment. *Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995) (summary judgment is improper "if a reasonable fact finder evaluating evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact"); *Alabama Farm Bureau Mut. Cas. Co., Inc. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 609 (5th Cir. 1979) ("Summary judgment may be improper, even though the basic facts are undisputed, if the ultimate facts in question are to be inferred from them, and the parties disagree regarding the permissible inferences that can be drawn from the basic facts.").

Ultimately, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda*, 975 F.2d at 1534.

## Interpreting an Insurance Policy Under Florida Law

Because this is a diversity action, we apply the substantive law of Florida, the forum state, under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938). *Town Kitchen LLC v. Certain Underwriters at Lloyd's, London*, No. 21-10992, 2022

WL 1714179, at *1 (11th Cir. May 27, 2022). That means we must follow Florida law as the Florida Supreme Court has construed it. *Id.* (citing *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1021 (11th Cir. 2014)). And where the Supreme Court has not yet opined on the issue we consider, we must "adhere to decisions of the state's intermediate appellate court absent some persuasive indication that [the Florida Supreme Court] would decide the issue otherwise." *Id.* (citation and quotation marks omitted).

Under Florida law, an insurance policy should be read "as a whole, endeavoring to give every provision its full meaning and operative effect." *SA Palm Beach, LLC v. Certain Underwriters at Lloyd's London*, 32 F.4th 1347, 1356 (11th Cir. 2022) (quoting *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007) (citation omitted)).

If the relevant language is plain and unambiguous, then it is interpreted as written. *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Menendez*, 70 So. 3d 566, 569–70 (Fla. 2011)). But if there is an ambiguity, then it is construed against the insurer and in favor of coverage. *Id.* (citing *U.S. Fire Ins. Co.*, 979 So. 2d at 877).

Language is not ambiguous merely because the policy fails to define a term, or because the parties disagree about its meaning. *See id.* at 1356 (citing *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 166 (Fla. 2003)). A policy is ambiguous only when "its terms make the contract susceptible to different reasonable interpretations, one resulting in coverage and one resulting in exclusion." *Id.* (citing *Gulf Tampa Drydock Co.*

*v. Great Atl. Ins. Co.*, 757 F.2d 1172, 1174–75 (11th Cir. 1985) (applying Florida law)).

However, the rule used in the interpretation of exclusionary clauses in insurance policies *also* provides that "[o]nly when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction is the rule apposite. It does not allow courts to rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Swire*, 845 So. 2d at 166 (citing *State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla. 1986)).

"[I]f a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *Taurus Holdings, Inc. v. USF&G*, 913 So. 2d 528, 532 (Fla. 2005) (explaining, in a ruling holding that insurance policy exclusion applied to exclude coverage, that the rule construing ambiguous provisions in favor of coverage requires that "the provision must actually be ambiguous").

Courts should "attempt to construe the contractual language in a manner which gives all the provisions effect." *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 739 (Fla. 2002) (holding that a Florida automobile collision policy requiring insurer to repair or replace a damaged vehicle "with other of like kind and quality" does not obligate the insurer to compensate the insured in money for any diminution in market value after the insurer completes a first-rate repair which returns the vehicle to its pre-collision

28

level of performance, appearance, and function).

As the Florida Supreme Court has explained, an "all-risk policy" does not extend coverage to "every conceivable loss." *SA Palm Beach, LLC*, 32 F.4th at 1357 (citing *Sebo v. Am. Home Assurance Co., In*c., 208 So. 3d 694, 696–97 (Fla. 2016) (citation omitted)). As a result, "[a]n insured claiming under an all-risk[ ] policy has the burden of proving that the insured property suffered a loss while the policy was in effect." *Id.* (citing *Empire Pro Restoration, Inc. v. Citizens Prop. Ins. Corp.*, 322 So. 3d 96, 98 (Fla. 4th DCA 2021) (internal quotation marks and citation omitted)) (also citing, generally, Andrew B. Downs & Linda M. Bolduan, 4 Law and Prac. of Ins. Coverage Litig. § 52:4 (2021) (explaining that under all-risk policies "all direct physical losses not excluded are covered")).

<u>Analysis</u>

ACE's motion requests that the Court find that the Policy does not cover the damage at issue because Plaintiff cannot meet its burden of proving a covered loss. [ECF No. 88, p. 1].

The summary judgment motion does **not** concern the initial Formwork claim, which ACE already paid, subject to the deductible.

The Policy at issue in this case is an all-risk policy. As noted, Florida courts have stated that "[a]lthough the term 'all-risk' is afforded a broad, comprehensive meaning, an 'all-risk' policy is not an 'all loss' policy, and this does not extend coverage for every

conceivable loss." *Sebo*, 208 So. 3d at 696–97 (Fla. 2016) (quoting *Fayad v. Clarendon Nat'l*

*Ins. Co.*, 899 So. 2d 1082, 1086 (Fla. 2005)).

Here, the Policy begins with the following language:

### INSURING AGREEMENT

This Policy, subject to the **terms**, conditions and **exclusions** stated herein, or endorsed hereto, **insures against all risk of direct physical loss or damage** to property of every kind and description intended to become a permanent part of, or consumed in, the fabrication, assembly, installation, erection or alteration of the Insured Project, as defined in the Declaration Page for which values have been declared and deposit premium paid.

[ECF No. 87-2, p. 42 (emphasis added)]. The Policy lists certain exclusions, including:

### EXCLUDED CAUSES OF LOSS

This policy does not insure loss or damage caused directly or indirectly by any of the following, and such loss or damage is excluded regardless of any other cause or event that contributes concurrently, or in sequence to the loss:

\* \* \*

**THIS POLICY DOES NOT INSURE LOSS OR DAMAGE CAUSED BY ANY OF THE FOLLOWING, UNLESS DIRECT PHYSICAL LOSS OR DAMAGE BY AN INSURED CAUSE OF LOSS ENSUES AND THEN THIS POLICY INSURES ONLY SUCH ENSUING DIRECT PHYSICAL LOSS OR DAMAGE**.

\* \* \*

19. Error, omission or deficiency in design, plans, specifications, engineering or surveying.

20. Faulty or defective **workmanship, materials** or supplies.

*Id.* at 46–49 (emphasis added).

Plaintiff purchased an endorsement ("LEG 3[5] Extension") which expanded the Policy. But the LEG 3 Extension **replaced** paragraphs 19 and 20 above to reflect the following:

> This Policy does not insure any costs rendered necessary by **defects** of **material**, **workmanship**, design, plan, or specification and should damage occur to any portion of the Insured Property containing any of the said defects, the cost of replacement or rectification which is hereby excluded is that cost incurred to **improve** the original material, workmanship, design, plan or specification.
>
> For the purpose of *this policy and not merely this exclusion* **it is understood and agreed that any portion of the Insured Property shall not be regarded as damaged** *solely* **by virtue or** [sic] **the existence of any defect of material, workmanship, design, plan, or specification**.

*Id.* at 36 (emphasis supplied).

Plaintiff argues that, pursuant to the Policy, Defendant is obligated to pay "for the costs of replacing, repairing, rectifying, and/or making good all insured property at the Project that sustains loss or damage in any manner or cause whatsoever unless expressly concluded." [ECF No. 92, p. 3].[6]

---

[5]   "LEG" is an acronym for London Engineering Group, a consultative body of insurers of engineering class risks, which has developed various iterations of "LEG 3" (and other) coverage terms pertinent to first-party insurance risk for defective work, design and/or materials. [ECF No. 1, p. 4 n.1]. The term "LEG" does not appear in the Policy. Instead, the language appears on a page entitled "Excluded Causes of Loss." [ECF No. 87-2, p. 36].

[6]   Plaintiff quotes language from the Policy included on the previous page of this Order, "This Policy, . . . *insures against all risk of direct physical loss or damage to property of every kind and description intended to become a permanent part of, or*

Defendant argues that the defective initial construction bars Plaintiff from proving a "direct physical loss or damage." [ECF No. 88, p. 5]. Defendant specifically highlights how the LEG 3 Extension defined "damage" as something involving more than damage "solely by virtue or existence of any **defect** of **material, workmanship**, design, plan, or specification." *Id*. at 7 (emphasis added). Under Florida law, insurance contracts must be construed in accordance with the plain language of the policy. *Swire*, 845 So. 2d at 165.

But the JV contends that it is not seeking to recover for damage "solely" by virtue or existence of any defect of material, workmanship, design, plan, or specification.

Builder's risk insurance is a type of property insurance coverage, not liability insurance or warranty coverage -- and should not "be transformed into a guarantee against design and construction defects." *Id.* at 168. The purpose of this type of insurance is to provide protection for fortuitous loss sustained during the construction of the building. If a described loss occurs, then the insurer generally pays the cost of removing the debris, salvaging material and equipment, and repairing the damaged property. However, those losses for which coverage is provided are clearly dependent upon the specific language of the builder's risk policy.

---

*consumed in, the fabrication, assembly, installation, erection or alteration of the Insured Project* . . . . " *Id*. at 3–4 (emphasis in original).

The Policy's "Insuring Agreement" specifies that it "insures against all risk of **direct physical loss** or damage." (emphasis added).

Thus, to meet its initial burden of proof, Plaintiff must establish that it sustained "direct physical loss or damage." But Florida law arising from the COVID-19 cases provides that this contractual language "requires a tangible alteration to the covered property." *SA Palm Beach*, 32 F.4th at 1358–59.

In addition, Plaintiff must confront the reality that, pursuant to the LEG 3 provision, the damage must be something *other than* covered property "damaged **solely** by virtue or [sic] the existence of any defect of **material**, workmanship, design, plan, or specification." (emphasis supplied).

The *SA Palm Beach* Court was predicting what Florida law would say about whether COVID-19 losses and expenses would be covered under all-risk commercial insurance policies because neither the Florida Supreme Court nor Florida intermediary appellate courts had addressed the issue. The Court there presumed that Florida would adopt the majority position (requiring a tangible alteration to the covered property) and independently concluded that the majority view is legally sound under Florida law. *Id.* at 1359.

Five days after issuing its opinion in *SA Palm Beach*,[7] the Eleventh Circuit issued *Town Kitchen*, another COVID-19 pandemic case, which noted that Florida's Third District Court of Appeal in *Commodore, Inc. v. Certain Underwriters at Lloyd's London*, 342 So. 3d 697 (Fla. 3d DCA 2022), confirmed its prediction on how Florida courts would construe the physical damage provision of these policies. 2022 WL 1714179, at *2. Indeed, the *Town Kitchen* Court also explained that *Commodore* "went further" and held that "direct physical loss of or damage to property "requires actual, tangible alteration to the insured property for coverage to be triggered under the Policy." *Id*. After noting that "economic losses do not satisfy that requirement," the *Town Kitchen* Court held that COVID-19 does not cause physical damage to property and upheld the dismissal of Town Kitchen's amended complaint (as *Erie* required it to follow *Commodore).*

In *Commodore,* a restaurant and bar in the Coconut Grove neighborhood of Miami, Florida filed a declaratory judgment action seeking confirmation that the losses it suffered when it suspended operations during the COVID-19 pandemic were covered under its insurance policy. 342 So. 3d at 697. The Court held that the phrase "direct physical loss of or damage to property," which was undefined in the policy, requires

---

[7]    The *SA Beach* Court noted that the district court relied on its unpublished decision in *Mama Jo's Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 879 (11th Cir. 2020), which it described as "holding that under Florida law an item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical.'" 32 F.4th at 1352. The *SA Palm Beach* Court explained that *Mama Jo's* was "persuasive" *and* "cuts against the insureds' argument that "direct physical loss or damage to" property does not require actual, tangible, structural or concrete harm to property but merely demands that the property no longer be suitable for its intended use." *Id*. at 1360–61.

some tangible alteration to insured property. It found that this interpretation comports with the common meaning of its terms and the context of the policy as a whole.

In the year and a half since Florida's Third District Court of Appeal issued *Commodore*, other courts, including out-of-state federal courts and the Eleventh Circuit Court of Appeals, have followed its teachings. *See, e.g., Royal Palm Optical, Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 21-11335, 2022 WL 1666967, at *2 (11th Cir. May 25, 2022) (in a COVID-19 case,[8] affirming order granting insurer's motion to dismiss and noting that "[t]he *Commodore* court rejected the insured's interpretation of loss as deprivation because it ignored the qualifying adjective physical: 'because the ordinary meaning of 'physical' carries a tangible aspect, 'direct physical loss' requires some alteration to the insured property'"); *PF Sunset View, LLC v. Atlantic Specialty Ins. Co.*, No. 21-11580, 2022 WL 1788920 (11th Cir. June 2, 2022) (affirming judgment on the pleadings to insurer in lawsuit filed by owners and operators of four Planet Fitness franchise locations because the COVID-19 business losses did not constitute direct physical loss of or damage to insured property "because the losses alleged here did not involve a tangible alteration of the insured properties – the franchisees' gym locations"); *Abbey Hotel Acquisition, LLC v. Nat. Surety Corp.*, No. 21-2609, 2022 WL 1697198 (2d Cir. May 27, 2022) (affirming order dismissing, under Florida law, the

---

[8]     The Eleventh Circuit's opinion does not discuss the facts or mention that they arose from restrictions imposed to slow the spread of COVID-19, but the District Court opinion [No. 20-cv-80749, S.D. Fla., March 30, 2021, ECF No. 79] reveals that the claim arose from business income allegedly lost because of the COVID-caused mandatory shutdowns.

insured hotel's breach of contract action against insurer and rejecting, under *Commodore,* the argument that "the [COVID-19] virus physically contaminated the surfaces and air supplies in [its] premises").

In addition to holding that the insured restaurant's loss of intended use of the property did not constitute "direct physical loss of or damage to property" and that "actual, tangible alteration to the insured property" is needed to trigger coverage, the *Commodore* Court summarized in detail the fundamental rules governing the interpretation of insurance policies under Florida law. Many of those rules we outlined above, in the section on "Interpreting an Insurance Policy Under Florida Law." But *Commodore* also noted some additional, more-specific rules which should be added to the legal mix here:

1.      "[S]imply because a provision is complex and requires analysis for application, it is not automatically rendered ambiguous." *Swire*, 845 So. 2d at 165; *accord Menendez*, 70 So. 3d at 570; *Grover Com. Enters. v. Aspen Ins. UK, Ltd.*, 202 So. 3d 877, 880 (Fla. 3d DCA 2016). *Id.* at 700.

2.      When a term or provision is undefined in the policy, its plain, everyday usage is applied. *Heritage Prop. & Cas. Ins. Co. v. Condo. Ass'n of Gateway House Apts. Inc.*, 344 So. 3d 52 (Fla. 3d DCA Aug. 18, 2021) (stating "well-established principle that '[w]hen a policy provision remains undefined, common everyday usage determines its meaning'" (quoting *Sec. Ins. Co. of Hartford v. Com. Credit Equip. Corp.*, 399 So. 2d 31, 34

(Fla. 3d DCA 1981))); *see also State Farm Fire & Cas. Co. v. Castillo*, 829 So. 2d 242, 244 (Fla. 3d DCA 2002) ("[T]erms utilized in an insurance policy should be given their plain and unambiguous meaning as understood by the 'man-on-the-street.'"). *Id.*

3.      Principles governing the construction of insurance contracts "dictate that '[w]hen construing an insurance policy to determine coverage the pertinent provisions should be read *in pari materia*.'" *City of Fla. City v. Pub. Risk Mgmt. of Fla.*, 307 So. 3d 135, 138 (Fla. 3d DCA 2020) (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000).

So, framed by these rules of interpretation, and **assuming for the sake of discussion** that the COVID-19 cases listed above also control here, in a non-COVID-19 scenario, the JV must establish that each of the 16 bridge elements constructed with inadequate cement, which resulted in low-strength concrete, sustained "direct physical loss or damage" -- **but** that damage: (1) must involve an "actual" and "tangible" "alteration" to the property[9] and (2) cannot be caused "solely by virtue or [sic] the existence of any defect of **material, workmanship,** design, plan, or specification." [ECF No. 87 ¶ 5 (emphasis added)].

---

[9]      *Suhaag Garden, Inc. v. Certain Underwriters at Lloyd's London*, 344 So. 3d 585 (Fla. 3d DCA 2022) (in a COVID-19 case, affirming order dismissing with prejudice complaint against insurer because loss of business income is insufficient to constitute direct physical loss). *See also First Watch Restaurants, Inc. v. Zurich Am. Ins. Co.*, No. 21-10671, 2022 WL 1634571 (11th Cir. May 24, 2022) (ruling for insurer in COVID-19 case based on *Commodore* and *SA Palm Beach*).

ACE argues that the bridge elements did not sustain a distinct, physical, tangible alteration because they were **never properly constructed in the first place**. They were always in a state of low strength, ACE says. To be sure, the inadequate concrete produced a negative economic impact because the 16 affected areas had to be strengthened, or, in a few instances, re-poured. But ACE's position is that this is different and distinct from a tangible physical alteration to property.

Significantly, the scenario here is not one where the defective components collapsed and damaged or destroyed adjacent property which had been properly constructed. Instead, it is a case of defective initial construction. In other words, according to ACE, there was no event which changed the concrete placed in the 16 bridge components from a satisfactory state into an unsatisfactory state. The 16 components were always defective, ACE says, because they were constructed with inadequate cement, a component of the low-strength concrete.

The JV argues that the COVID-19 cases discussed above are inapplicable. But ACE points out that some non-binding builder's risk insurance cases (not involving Florida law) decided before the COVID-19 cases have rejected Plaintiff's theory and have held that defective initial construction does not qualify as "direct physical loss or damage." *See, e.g., N. Am. Shipbuilding, Inc.*("NAS") *v. S. Mar. & Aviation Underwriting, Inc.*, 930 S.W.2d 829, 834 (Tex. Ct. App. 1996) ("the language 'physical loss of or damage to the vessel' does not cover the cost of repairing faulty initial construction"). The *NAS*

Court considered the analysis of the Fifth Circuit in *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267 (5th Cir. 1990), in which the court applied Louisiana law to a similar dispute over the coverage granting clause. The *Trinity* court reasoned as follows:

> The language "physical loss or damage" strongly implies that there was an **initial satisfactory state that was changed by some external event into an unsatisfactory state**—for example, the car was undamaged before the collision dented the bumper. It would **not** ordinarily be thought to encompass **faulty initial construction.**

916 F.2d at 270–71 (emphasis added).

Although the *Trinity* Court would have found coverage for "*accidents* resulting from defective design or workmanship," (emphasis added), it found no coverage for "the cost of **repairing defective initial construction**." *Id.* at 271. Ironically, ACE *did* provide coverage for the Formwork losses, finding that the loss was attributed to defective workmanship under the so-called "LEG 3" provision and asserting that "[t]he reasonable costs associated with removing the hardened concrete from the original pour, repouring the concrete, **repairing/replacing** damaged forms, and **reinstalling** the forms in the design that existed on the date of loss will be covered subject to the $250,000 [LEG 3] deductible." [ECF No. 92, p. 7 (emphasis added)].

In other words, the JV contends, ACE issued "diametrically conflicting coverage analyses for the losses." *Id.* Moreover, ACE's coverage for the Formwork losses seems contrary to its argument that *Trinity* precludes coverage for the cost of repairing initially defective construction. In addition, ACE's coverage appears inconsistent with its view

that there is no coverage for the primary claim here because Plaintiff's repair work *improved* the property. How would repouring concrete (to replace concrete which was initially defective) and replacing damaged forms not constitute an improvement to the insured property?

ACE does not say, and the Undersigned concludes that reasonable jurists and jurors could view its position to be *fundamentally* inconsistent.

ACE argues that many other courts (but not ones using Florida law) have followed the *Trinity* rule and the cases relying on it. *See, e.g., City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 45 (2d Cir. 2003) (inclined to conclude that coverage under all-risk policy insuring "against risks of direct physical loss or damage to the property insured" did not extend to cover costs of repairing defective welds that had not yet failed but certifying questions to the Vermont Supreme Court); *Whitaker v. Nationwide Mut. Fire. Ins. Co.*, 115 F. Supp. 2d 612, 617 (E.D. Va. 1999) (granting summary judgment for insurer and determining that "an 'all risks' policy's coverage of fortuitous losses does not mandate coverage for the repair of construction defects as part of a direct physical loss"); *Bethesda Place Ltd. P'ship v. Reliance Ins. Co.*, Civ. A. No. HAR 91–1719, 1992 WL 97342, at *3 (D. Md. Apr. 22, 1992) (stating that "case law does not support the argument that a design defect in and of itself constitutes physical injury or damage to property from an external cause"); *Wolstein v. Yorkshire Ins. Co.*, Ltd., 97 Wash. App. 201, 211–13, 985 P.2d 400, 407–08 (1999) (concluding that coverage under

policy insuring "against all risks of physical loss of or damage" did not extend to cover costs to repair faulty workmanship or faulty initial construction of vessel and noting that *NAS* held that determining that a "builder's risk insurance policy covers defective workmanship would convert the policy into a performance bond").

But the "LEG 3" provision *does* provide coverage for costs incurred for the repair of defective workmanship, material, design, plan, or specification, as long as the work is not to improve the original material, workmanship, design, plan, or specification. In fact, ACE, in effect, acknowledges this Policy interpretation in its reply memorandum. *See* [ECF No. 100, p. 5 (explaining that the LEG 3 endorsement replaced a "broad" exclusion "with language that is more favorable to the policyholder" and noting that "if the subject defective concrete were to cause a collapse, the collapse damage would be covered, and only the costs of improving the work (e.g., to avoid another collapse) are excluded")].

According to ACE, to constitute "direct physical loss or damage," an *external* event is also required. Citing mostly out-of-circuit, non-binding cases, it contends that all-risk insurance policies limit recovery "to those losses in which the cause is 'external to the structure insured,' as opposed to an 'internal' or 'inherent' defect in the item of property which is damaged." *Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co.*, 219 F.3d 501, 507 (5th Cir. 2000) (affirming summary judgment for insurer in case involving **cracking in pile caps** used in construction of five-story tower, causing reduction in

capacity to bear the building's weight) (citation omitted); *Laquila Const. Inc. v. Travelers Indem. Co. of Ill.*, 66 F. Supp. 2d 543 (S.D.N.Y. 1999) (granting insurer's summary judgment motion under New York law because the **cost to repair defective concrete in flooring slabs** was not covered under builder's risk policy); *Trinity Indus., Inc.* at 916 F.2d 267, 270–71 (applying Louisiana law and opining that "[t]he language 'physical loss or damage' strongly implies that there was an initial satisfactory state that was changed by some external event into an unsatisfactory state.").

ACE argues that no external event changed the concrete placed in the 16 bridge components from a satisfactory state into an unsatisfactory state. It says the bridge components were defective from the start, as they were constructed with inferior concrete, contaminated by excessive fly ash.

Plaintiff stresses the point that the Policy confers expansive "all-risk" coverage to "property of every kind and description" intended to be used in the Project.

The JV argues that a valve in Batch Plant No. 1 failed, resulting in excessive levels of fly ash mixing with the cement paste and ultimately producing the low-strength concrete. It also emphasizes that the Policy does not require that the covered property (i.e., of every kind and description) be in a satisfactory state *before* the loss. And Plaintiff criticizes ACE's reliance on non-binding case law to "feign support for its attempt to superimpose a 'satisfactory state' requirement into the Policy *ex post facto*" as "misplaced." [ECF No. 92, pp. 9–10].

Plaintiff also contends that ACE's reliance on *Trinity* and *N. Am. Shipbuilding, Inc. v S. Marine & Aviation Underwriting, Inc.* is unavailing because neither of the cases involved a broad definition of insured property (i.e., "property of every kind and description") and because neither addresses a LEG 3 coverage enhancement.

In *North American Shipbuilding*, a Texas state appellate court, citing *Trinity*, affirmed summary judgment under Texas law in favor of the insurer because coverage for "'physical loss of or damage to the vessel' did not extend to costs of repairing faulty initial construction." 930 S.W. 2d at 833. In particular, the welds on a hull failed tests because the shipbuilder insured had received improperly mixed welding gas from a third-party supplier. The appellate court found it significant that the case did not involve faulty workmanship which *caused an accident*. If it had, then there would have been coverage, the appellate court concluded.

But Plaintiff says that *North American Shipbuilding* is easily distinguishable because: (1) the faulty welding product was brought to the site by an outside supplier, who was not the insured; and (2) the weld product was not produced at the insured's project site, so it did not constitute property covered under the policy. In the instant case, the JV points out, the damage was to raw cement mix, concrete batches and adjacent produce elements -- all of which qualify as covered property it (the insured) produced at the onsite plant.

Moreover, the JV also points to a more-recent federal court decision which reached the opposite conclusion. Specifically, in *N. Assurance Co. of Am. v. C & G Boat Works, Inc.*, No. 11-00283, 2012 WL 1712594 at *13 (S.D. Ala. May 15, 2012), the court denied the insured's summary judgment motion (seeking a favorable declaratory judgment ruling of no coverage) and granted the insured's summary judgment motion in an all-risk insurance coverage case involving engine damage to a boat's engines caused by several scenarios, including weld spatter and other contaminants in the oil piping systems that the insured builder constructed. The court there rejected the insured's reliance on the policy's faulty procedures exclusion stating that the insurer "shall not pay for any loss, damage or expense caused or arising in consequence of [f]aulty production or assembly procedures even if constituting faulty design." Instead, the court applied an exception to an exclusion as grounds to find coverage under the policy.

Plaintiff emphasizes its position that the raw cement mix was damaged by contamination with excessive fly ash and analogizes that scenario to food spoilage and contamination case law.

For example, in *Zurich Am. Ins. Co. v. Cutrale Citrus Juices USA, Inc.*, No. 5:00-CV-149-OC-10GRJ, 2002 WL 1433728, at *1 (M.D. Fla. Feb. 11, 2002), trace amounts of food-grade propylene-glycol refrigerant leaked into not-from-concentrate orange juice during its production. There, like ACE here, the insurer argued the contamination of the

orange juice did not cause "physical damage" but merely "economic losses [that] do not constitute property damage." *Id*. at *3. The court rejected this argument, holding:

> Fruit juice is tangible property, and the accidental introduction of an adulterant is a physical event that causes injury or damage just as surely as the damage resulting from the collision of two automobiles. Further, the fact that the adulteration does not make the resulting blend totally unfit for human consumption (so that the blended juice might still be marketed under different labeling), does not alter the conclusion that damage has occurred . . . .

*Id*. (footnote omitted).

In alignment with *Cutrale*, other courts have held that contamination of a product constitutes property damage under an insurance policy. *See, e.g., Nat'l Union Fire Ins. Co. v. Terra Indus., Inc.*, 346 F.3d 1160 (8th Cir. 2003) (affirming summary judgment for insured and finding covered property damage when excess benzene contaminated carbonated beverages); *Gen. Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152 (Minn. Ct. App. 2001) (concluding "all risk" policy insured food manufacturer who sustained direct physical loss or damage to its oat products resulting from contractor treating oats with FDA unapproved pesticide); *Shade Foods, Inc. v. Innovative Prods. Sales Mktg., Inc.*, 93 Cal. Rptr. 2d 364, 367–77 (Cal. Ct. App. 2000) (holding presence of wood splinters in almonds caused "property damage" within the meaning of commercial general liability policy when contaminated almonds were incorporated into nut clusters and cereal products).

ACE did not discuss these contamination-type cases in its Reply.

45

Meanwhile, the JV relies heavily on *SCB*, a case which is **strikingly similar** to the instant case, which is why a comprehensive discussion of it is appropriate.

The *SCB* Court noted the COVID-19 cases "are cases where courts held that businesses could not recover for economic losses stemming from their inability to operate during their closure because neither the virus nor the corresponding shutdowns constituted 'physical loss' or 'damage' under those policies." 2023 WL 6388974, at *7. (citation omitted). Accordingly, the Court held that the COVID-19 cases do not require "that the terms used in [the] Policy be construed to exclude coverage for repairing and replacing flawed concrete that caused structural weakness." *Id.*

Not only is *SCB* factually similar to the instant case (as we will explain below), but Plaintiff says "it represents one of the first decisions in the country to analyze the interpretation of enhanced LEG 3 builder's risk coverage."[ECF No. 92, p. 11].

*SCB* involved an insured who suffered structural integrity damage when poor vibration of concrete batches caused malformations known as "honeycombing" and "voiding," which weakened the structural integrity of the bridge. 2023 WL 6388974, at *3. Through faulty and inadequate vibration of the concrete as it was being placed, structural deformities appeared in the concrete that *reduced the structural strength of the concrete structures and integrity of the bridge itself. Id.* The insured repaired those weakened concrete structures by either patching, altering, or replacing them. *Id.*

On cross-motions for summary judgment, the sole issue was "whether 'damage' is properly understood to include costs of fixing concrete flaws that weakened the bridge." *Id.* at *5. The court held "[t]he answer is unquestionably yes." *Id.* In reaching its holding, the court noted that, like the Policy here, the policy did not define "damage." *Id*. Nevertheless, the court applied the plain language understanding of the term damage, which it defined as "'loss or injury to person or property' or 'any bad effect on something.'" *Id*. (quoting Damage, Black's Law Dictionary (10th ed. 2014)).

On the undisputed facts, the insured showed the faulty vibrations "caused a decrease in the weightbearing capacity of the bridge and its support structures" and, according to the court, such decrease in "weightbearing capacity is surely an injury, or at the very least a bad effect, on the bridge and its support structures." *Id*. That is substantially similar to the type of scenario present in the instant case.

Then, turning to the policy as a whole, the court held the policy's faulty or defective workmanship exclusion which barred coverage for "loss, damage or expense caused directly or indirectly by . . . [f]aulty or defective workmanship or materials" made clear that "'faulty or defective workmanship' can cause 'loss, damage or expense'—otherwise this exclusion would not have been necessary." *Id*. at *6.

In other words, property does not need to be in an initial satisfactory state to be capable of sustaining damage, as ACE has proposed here. In fact, the court was unimpressed with the insurer's argument that the policy requires some "initial

satisfactory state," noting that the insurer did not explain how the cases are analogous or why they should be considered persuasive. *Id*. at *8.

ACE relies upon *Trinity* for its argument that the insured property must initially have been in a satisfactory state. But *Trinity* is a non-binding, out-of-circuit case applying Louisiana law, not Florida law. In addition, the policy there does not include a similar broad definition of insured property (i.e., "of every kind and description"). Furthermore, ACE had admitted that the cement and fly ash *were* in a satisfactory state before being mixed. Additionally, the LEG 3 language was not present.

The *SCB* Court also rejected three of the primary arguments which ACE makes here: (1) that insured property must be **altered**, not merely defectively constructed, to constitute physical loss or damage;[10] (2) the concrete components did not become defective because they were defective from the start, when they were fabricated; and (3) the incorporation of defective components into a larger project does not constitute damages.

The *SCB* Court classified the insurer's arguments as unpersuasive, and those reasons could apply here, as well.

---

[10]     But the court there was not using Florida law, which, as already noted, requires a distinct, demonstrable, physical alteration of the property. *SA Palm Beach,* 32 F.4th at 1358–59 (holding that COVID-19 "did not cause any material alteration of the insured's properties" and explaining that "clean[ing] to eliminate the particles of the virus" does not constitute a "physical loss to" the properties). *See also Commodore,* 342 So. 3d at 704 ("direct, physical loss of or damage to property" requires "actual, tangible alteration to the insured property for coverage to be triggered under the Policy.").

**First,** it noted that "a change that results in a reduction in the weightbearing capacity of a bridge *is* an 'alteration' to that bridge." *Id*. at *7 (emphasis added).

Similarly, ACE has not explained how concrete, which failed its 28-day test, is anything other than a compromise to the physical integrity to the bridge components on which the cement was poured. The JV's expert witness has offered his opinion on how the bulk of the cement mix was damaged by virtue of contamination with excess volumes of fly ash. The Undersigned is not prepared to accept ACE's argument that damage to the cement did not involve a physical alteration.

According to his report, Dr. Radlinski was retained to "opine on whether the materials used in the subject elements were damaged, and, if yes, what resulting effects it had on those elements." [ECF No. 103-5, p. 8]. Among other opinions, Dr. Radlinski concluded that "[t]he incorporation of the damaged cement in concrete/grout batches placed in the subject elements had detrimental effect on their physical properties, including compressive strength and rate of hardening, due to **altered composition and microstructure of the binder**." *Id* at 37–38 (emphasis added).

Plaintiff contends that the cement mix suffered damage when it became contaminated with fly ash. It points out that even ACE did not challenge that the raw cement mix was in a satisfactory state before it was contaminated.

Indeed, in its answer to Plaintiff's Interrogatory No. 6, Defendant conceded the point: "Without Waiving the General Objection, ACE states that ACE believes the

cement mix and fly ash were **each in a satisfactory state** before being combined together during the concrete batching process." [ECF No. 94-6, p. 7 (emphasis added)]. After submitting this under-oath interrogatory answer, ACE *later* tried to claim that the fact was "disputed," arguing that "Plaintiff has presented no admissible evidence that the cement and fly ash each (sic) in a satisfactory state before being mixed together." The Court is not impressed with this tactic and deems the initial interrogatory answer to constitute the undisputed fact that both were in a satisfactory state.[11]

The same theory applicable to the raw cement mix could also logically apply to the concrete batches. According to Plaintiff's argument, when the contaminated cement mix was later combined with water to produce weakened concrete batches, those concrete batches were damaged. *See Selective Way Ins. Co. v. CSC Gen. Contractors, Inc.,* 994 F.3d 952, 956–57 (8th Cir. 2021) (holding, in a declaratory relief action brought by an insurer that it had no duty to defend or indemnify a general contractor in the project owner's action regarding defective concrete, that the project owner's parking lot was physically damaged when while pouring concrete for the parking lot, and that the subcontractor added too much water to the cement mixture before it hardened).

**Second**, the *SCB* Court found the insurer's authorities to be inapposite. As noted, it found the COVID-19 cases dissimilar. Indeed, it concluded that a closer examination

---

[11]     David Trippel, ACE's AVP Executive Claim Director, North American Property Claims, signed ACE's interrogatory answers.

of the cases reveal that they *"undermine"* the insurer's argument. 2023 WL 6388974, at *7.

For example, a government edict alone[12] could not constitute a direct physical loss

under an insurance policy because there was "no compromise to the physical integrity"

of the insured property. *Id*. Therefore, the court concluded, the insurer could not

persuasively explain "how a reduction in the weightbearing capacity of the bridge is

anything other than a "compromise to [its] physical integrity." *Id.*

In dismissing the case authorities relied upon by the insurer, the *SCB* Court

noted that insurance policies within those cases were Commercial General Liability

(CGL) policies, which it explained were "distinct" from the builder's risk policy that the

plaintiff purchased. The *SCB* Court highlighted the point that the difference in

insurance policies is "critical." *Id*. at *8. This point is not particularly helpful to the JV, as

ACE did not rely largely on CGL cases.

However, there is an additional feature here which undermines ACE's position,

but which was not present in *SCB*: ACE's inconsistent coverage positions concerning

damage to adjacent components, which it paid for under the policy.

Plaintiff submits it also suffered damage to adjacent project components that

became encapsulated in and/or adhered to damaged concrete batches as they were

poured into forms and over rebar to construct highway segments. To repair certain

portions of the Project, these components had to either be **reinforced** with added layers

---

[12]    *See Roses 1, LLC v. Erie Ins. Exchange*, No. 2020-CA-002424, 2020 WL 4589206, at
*3 (D.C. Super. Aug. 6, 2020).

of structural material and concrete, or **torn** from the concrete structures, destroyed and **replaced** during subsequent concrete pours. ACE's summary judgment motion does not discuss this development, presumably because ACE has conceded to such coverage under the Policy and made associated payments under the Policy for Plaintiff's related Formwork Loss.

Of course, if ACE paid for the JV to *repour* concrete, then the new concrete would arguably be an *improvement* (albeit a necessary one) over the defective concrete. But ACE says the LEG 3 provision does not pay for improvements. More on this seemingly illogical coverage analysis later, when we discuss the LEG 3 provision in greater detail.

Plaintiff argues that the incorporation of the damaged concrete into the Project also caused damage to the highway superstructure. Dr. Radlinski opined that the "[i]ncorporation of concrete/grout batches containing the damaged cement and exhibiting low strength and delayed hardening into the subject elements (Table 1) had **detrimental effect on their structural capacity** and rendered them not fit for their intended use." [ECF No. 94-2, p. 31]. He also explained that "the subject auger cast grout piles were rejected due to **impaired structural capacity** associated with the incorporation of the damaged cement." *Id*. at 31–32 (emphasis added). Likewise, he noted that "the subject elements were rejected because they contained concrete/ grout that exhibited inadequate strength gain and failed to meet the specified compressive strength, rendering them "**structurally inadequate**." *Id*. at 32 (emphasis supplied).

Plaintiff relies on a few other cases to bolster its position that incorporation of damaged concrete into a larger system constitutes property damage. In addition to citing *SCB*, Plaintiff cites *Pavarini Construction Co. (Se) Inc. v. **ACE Am. Ins. Co**.*, 161 F. Supp. 3d 1227, 1230 (S.D. Fla. 2015) (emphasis added), to demonstrate ACE's involvement in another case; *Harleysville Worcester Ins. Co. v. Paramount Concrete, Inc.*, 10 F. Supp. 3d 252, 257 (D. Conn. 2014); *Chubb Ins. Co. of N.J. v. Hartford Fire Ins. Co.*, No. 97 CIV. 6935,1999 WL 760206, at *4 (S.D.N.Y. Sept. 27, 1999); *Nat.l Union Fire Ins. Co. of Pittsburgh, P.A. v. Tera Indus., Inc.*, 216 F. Supp. 2d 899, 918–19) (N.D. Iowa 2002); and *U.S. Fid. & Guar. Co. v. Nev. Cement Co.*, 561 P.2d 1335, 1338 (Nev. 1977) ("We therefore think the trial court properly determined that the defective cement caused injury to tangible property within the meaning of respondent's insurance policy . . . .").[13]

In *Pavarini,* the insured defectively installed concrete masonry unit walls and reinforcement steel which compromised the building's structural integrity leading to various cracking. The court found that "if the defective work causes damage to otherwise non-defective property, i.e., if the inadequate subcontractor work caused cracking in the stucco, collapse of the penthouse enclosure, and cracking in the critical

---

[13]     Plaintiff also cited *Unifoil Corp. v. CNA Ins. Cos.*, 528 A.2d 47 (N.J. Super. Ct. App. Div. 1987) for the purported proposition that "costs of shoring defective concrete constituted damages because of 'property damage.'" But this is surely a mistake, as that case involved an insured manufacturer of foil-laminated paper used to manufacture lottery tickets -- and had absolutely nothing to do with concrete.

concrete structural elements, [then the] [d]efendant is entitled to coverage for the repair of the non-defective work." 161 F. Supp. 3d at 1233 (footnote omitted).

In determining the scope of covered repairs, the court further held that "[e]ven if the predominant objective of the repair effort was to fix the instability caused by the defective subcontractor work, it is undisputed that the same effort was required to put an end to ongoing damage to otherwise non-defective property . . . ." *Id.* (referencing *Carithers v. Mid-Continent Cas. Co.*, 782 F.3d 1240 (11th Cir. 2015)). Accordingly, the court held ACE's policy covered the loss. *Id.*

In *Harleysville*, an insurance dispute arose over an insurer's failure to provide coverage for a claim involving damage to swimming pools constructed with defectively produced concrete known as "shotcrete." 10 F. Supp. 3d at 257. Albeit the coverage sought was under a general liability policy, the court, citing numerous national caselaw, held that the defective shotcrete "caused harm to the larger system" and was the type of case that "falls squarely within the category of defective component cases where courts have found an 'occurrence' causing 'property damage.'" *Id.* at 263 (citing *Aetna Cas. & Sur. Co. v. Gen. Time Corp.*, 704 F.2d 90 (2d Cir. 1983) (finding incorporation of defective motor into radiator valve that caused valve to malfunction was an occurrence)).

From an overall perspective, ACE tries to distinguish these cases by noting that they are: (1) CGL cases; and (2) from other jurisdictions and/or involve factual scenarios

where defective work or materials resulted in damage which compromised the structural integrity of otherwise non-defective property.

<u>The LEG 3 Provision</u>

The so-called LEG 3 provision effectively **expands** coverage by deleting exclusions (paragraphs 19 and 20) and replacing them with narrower exclusions (and an additional deductible). In fact, ACE conceded in its Reply, that this endorsement "replaces this 'broad' exclusion[14] with language that is more favorable to the policy holder." [ECF No. 100, p. 5 (footnote added)]. In practical terms, the broader coverage authorizes replacement or repairs for costs created by defects of material, workmanship, design, plan, or specification but does not cover costs to "improve" the original material, workmanship, design, plan, or specification.

Moreover, the LEG 3 provision applies for purposes of the entire policy, not "merely this exclusion." And it provides that any portion of the Insured Property "shall not be regarded as damaged *solely* by virtue or the existence of any defect of material, workmanship, design, plan, or specification." (emphasis added).

_____

[14]     ACE's Reply explains that traditional policy exclusions preclude coverage for the defective property *and* for an ensuing collapse caused by the subject defect. [ECF No. 100, p. 4]. *See, e.g. Narob Dev. Corp. v. Ins. Co. of N. Am.*, 219 A.D.2d 454, 631 N.Y.S.2d 155 (1995) (collapse of a wall not covered because it was caused by, and directly resulted from, the plaintiff's defective workmanship); *Taja Invs. LLC v Peerless Ins. Co.*, 717 F. App'x 190 (4th Cir. 2017) (collapse excluded because damages were the direct result of faulty workmanship). The LEG 3 endorsement used here eliminates this broad exclusion and replaces it with language (albeit ambiguous, as we will soon learn) which provides additional coverage (i.e., a narrower exclusion).

In its response to Plaintiff's Statement of Additional Facts, ACE disputes that the LEG 3 provision expands coverage, noting that it is entitled "Excluded Causes of Loss" and that it "simply replaces" a more-limiting exclusion. The Undersigned is not convinced by this argument, and neither was the *SCB* Court when evaluating a similar LEG 3 provision. Regardless of the title of the page, the obvious point is that the provision *narrowed* an earlier *exclusion*, which is another way of saying that the provision **expanded coverage**.

> The *SCB* Court turned to the LEG 3 provision, which in significant ways mirrors the Policy's LEG 3 Extension in the dispute between ACE and Plaintiff here: For purposes of this policy and not merely this exclusion it is understood and agreed that any portion of the Insured Property shall not be regarded as damaged solely by virtue of the existence of any defect of material workmanship, design, plan, or specification.

[ECF No. 87-2, p. 36].[15]

---

[15] But the language in the two provisions is not *completely* identical. Part of the provision in *SCB* provides:

> All costs rendered necessary by defects of material workmanship, design, plan, or specification and should damage (which for the purposes of this exclusion shall include **any patent detrimental change in the physical condition of the Insured Property**) occur to any portion of the Insured Property containing any of the said defects, the cost of replacement or rectification which is hereby excluded is that cost incurred to improve the original material workmanship design plan or specification.

2023 WL 6388974, at *2 (emphasis added). The language highlighted in bold is not in the Policy's LEG 3 provision here.

The *SCB* Court noted that "caused by" and "solely by virtue of the existence" are "not the same." 2023 WL 6388974, at *2. Based on this distinction in language, the court held "[t]he [e]xtension does not suggest that property cannot be 'damaged' if there were defects in material workmanship somewhere in the causal chain. Instead, it indicates that defects of material workmanship *in and of themselves* are insufficient to constitute damage." *Id.* (emphasis in original). Therefore, the extension's exclusionary language was inapplicable because the insured was not seeking reimbursement "solely for its defective work" but, instead, the insured's "defective work that led to . . . decreased structural integrity of the bridge." *Id.* (emphasis in original).

Similar to the analysis in *SCB*, the JV here says it is not seeking reimbursement of costs *solely* for the defective material. Rather, Plaintiff's claim is that the fly ash which contaminated the cement consequently led to defective concrete which in turn led to the impaired structural integrity of the bridge components. ACE may quibble about the facts and challenge Plaintiff's expert about the consequences of the fly ash tainting the cement which was used to manufacture the concrete, but its challenges illustrate the existence of a factual dispute which is best not resolved in a summary judgment context.

The *SCB* Court described the LEG 3 provision as "tortured" and "egregiously ambiguous." *Id.* at *6, 9. It also classified it as "internally inconsistent" and "bordering

57

incomprehensible," and it noted that calling the language "convoluted" is "an understatement." *Id.* at *9.[16]

The first ambiguity noted by the *SCB* Court is a disagreement over whether the provision is in fact an extension at all. Similar to ACE's position here, the insurer there (Lexington Insurance Co.) argued that the provision is really an exclusion because it was intended to delete and replace portions of the "Perils Excluded" section of the policy. Here, ACE disputed that the language constitutes an extension. While it is certainly correct that the language is on a page titled "Excluded Causes of Loss," the *SCB* Court's position -- "of course, two things can be true at once" -- applies here. The court acknowledged that the language is an exclusion, but then further explained "in replacing a broad exclusion from coverage with a narrower exclusion, the endorsement *functionally extends* what SCB is entitled to recover for." *Id.* (emphasis in original). Thus, ACE's endorsement generates a functional extension, or broadening, of coverage.

The *SCB* Court then turned to the scope of the exception, which, in language virtually identical to the language in the Policy at issue here, excludes costs incurred to "improve" the original workmanship. The court focused on the practical realities flowing from the use of the term "improve." For example, what, exactly, does it mean to "improve" the original workmanship?

---

[16]    The language which led to the court's condemnation is not the additional language noted in the previous footnote here.

The *SCB* Court explained that the insured seemingly suggested that it means "making it better than originally planned." *Id*. at *10. Therefore, the court noted, if the contractor decided to replace the defective concrete with solid gold or otherwise upgrade it, then the insured could not seek reimbursement for those enhancements. *Id*. On the other hand, under the defendant's view, simply patching or replacing defective components constituted an improvement.

After all, the court stated, "if something broken gets fixed, hasn't that thing been improved?" *Id*. The *SCB* Court determined that this argument had "intuitive appeal" which "falls apart upon closer scrutiny." *Id.* The analysis supporting the court's conclusion applies with equal vigor here:

> Sure, repairing or replacing a defective component can *technically* be considered an improvement–unless that component is replaced with something worse. However, the context of the [e]xtension suggests that to improve means make a thing *better* than it would have been if it were not for defective work. In fact, the [e]xtension explicitly distinguishes the "cost incurred to improve" work from "the cost of replacement or rectification." Lexington's suggestion that the two are coextensive is unavailing.

*Id*. (emphasis in original).[17]

Significantly, the *SCB* Court held that the provision is ambiguous because it is "subject to more than one reasonable interpretation." *Id*. at *11. In fact, it concluded that the insured's reading was "more plausible." Consequently, the court held that the Extension is "ambiguous as to whether it excludes coverage." Therefore, the court

---

[17]     The LEG 3 provision in ACE's policy also makes this distinction.

found that it must construe it against its drafter, Lexington, and in favor of coverage, under Illinois law. Florida law, as outlined in the initial legal standards section of this Order, is the same on this point.

Given that *SCB* undermines ACE's position and provides support for the JV's interpretation, ACE attempts to distinguish it. Its primary argument is that *SCB* involved resulting damage to property other than the defective concrete -- a bridge which was not independently defective. ACE noted that the defective concrete caused a reduction in the weight bearing capacity of the non-defective bridge and that this then altered the bridge. According to ACE, there was no alteration to non-defective aspects of the Project because "there is no allegation that any other properly constructed elements suffered a loss of weight bearing capacity." [ECF No. 100, p. 4].

ACE proclaims that this case "involves defective concrete pours -- nothing more." *Id*. Importantly, ACE argues, Plaintiff is seeking costs incurred solely to rectify defective material and workmanship -- not resulting damage or loss of capacity to some other aspect of the Property. In addition, ACE again emphasizes its view that these repairs were to improve the property -- a circumstance in which coverage is not provided.

But, as outlined above, the term "improve" is ambiguous and therefore is construed against ACE. In addition, ACE's efforts to distinguish *SCB* overlooks the expert opinions of Dr. Radlinski, who said, among other conclusions, that

"[i]ncorporation of concrete/grout batches containing the damaged cement and exhibiting low strength and delayed hardening into the subject elements (Table 1) had **detrimental effect on their structural capacity** and **rendered them not fit for their intended use**." [ECF No. 94-2, p. 31 (emphasis added)].

Finally, the *SCB* Court noted that in considering the phrase "damage" in accord with the parties' intent, the insured purchased the "all-risk" policy for the construction of the bridge and that "[o]ne such risk, inherent in any complex construction project, is damage from errors of workmanship." 2023 WL 6388974, at *6. Accordingly, the court held "[t]he plain language of the coverage provision, the policy as a whole, and the intent of the parties suggests that structural damage stemming from [the insured's] defective workmanship is within the scope of coverage." *Id.*

Here, consistent with *SCB*, the JV contends it is not seeking coverage *solely* for defective work, but rather damage caused by the defective work (i.e., the Plant). Specifically, as evidenced by the facts highlighted in Plaintiff's presentation, due to the Plant's malfunction during the batching process: (1) the insured raw cement mix became damaged by contamination with excess fly ash; (2) the damaged cement mix then combined with water and other elements to form damaged concrete batches; and (3) the damaged concrete batches were then incorporated into various Project structures causing damage to (a) adjacent components such as rebar, forms, steel, etc., and (b) the structural integrity of the highway superstructures. Thus, based on the plain language

of the Policy construed as a whole, Plaintiff's claim encapsulates "physical loss or damage" to insured property not otherwise excluded.

ACE, of course, urges the contrary position, but this factual tension (about whether the claim is "solely by virtue of the existence of any defect or material, workmanship, design, plan[,] or specification") is more appropriate for resolution by the jury at trial. *See generally Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (affirming order denying the defendant's summary judgment motion and noting that contradiction in factual positions "is the stuff of which jury trials are made").

Given the significant factual disputes and the ambiguous language in the policy, the Undersigned concludes that ACE's primary position of no coverage should be evaluated at trial and not conclusively determined in a summary judgment setting.[18]

### ACE's late notice theory

ACE's late notice argument, if established without material factual disputes, would be grounds to deny recovery under the policy and justify a summary judgment in its favor. *See generally Gemini II Ltd. v. Mesa Underwriters Specialty Ins. Co.*, 592 F. App'x 803 (11th Cir. 2014) (affirming, under Florida law, a summary judgment in favor of the insurer because of insured's late notice and its failure to rebut the presumption of

---

[18]    Plaintiff's position is not without its faults. *See, e.g., Laquila Const. Inc. v. Travelers Indem. Co. of Ill.*, 66 F. Supp. 2d 543 (S.D.N.Y. 1999) (cost to repair defective concrete in flooring slabs not covered under builder's risk policy). Nevertheless, the facts are sufficiently similar to *SCB* to counsel restraint.

prejudice caused by untimely notice). But ACE spent only one and a half pages on this potentially-dispositive issue in its motion (and only a half page in its Reply). Of course, the mere fact that ACE presented a comparatively short argument does not mean the argument is incorrect or worthy of special scrutiny. Nevertheless, there is a more-basic reason to reject the late notice argument for summary judgment evaluation purposes: there are still material factual disputes, which therefore prevent a summary judgment ruling in ACE's favor.

As an initial matter, the policy requires notice "as soon as practicable," which courts interpret to mean that notice should be given "within reasonable dispatch and within a reasonable time in view of all of the facts and circumstances of the particular case." *Yacht Club on the Intracoastal Condo. Ass'n, Inc. v. Lexington Ins. Co.*, 599 F. App'x 875, 879 (11th Cir. 2015). But it is "well settled, however," that the phrase does "not require instantaneous notice." *Laquer v. Citizens Prop. Ins. Corp.*, 167 So. 3d 470, 474 (Fla. 3d DCA 2015).

However, "to be clear," there is "no 'bright-line' rule under Florida law setting forth a particular period of time beyond which notice cannot be considered "prompt." *Yacht Club*, 599 F. App'x at 879 (citing *Kings Bay Condo. Ass'n, Inc. v. Citizens Prop. Ins. Corp.*, 102 So. 3d 732 (Fla. 4th DCA 2012)). "Rather, as would be expected given a standard that depends on facts and circumstances, Florida courts have found that notice several years after an occurrence is "prompt" in some cases, but not others. *Id*.

In *LoBello v. State Farm Fla. Ins. Co.*, 152 So. 3d 595 (Fla. 2d DCA 2014), for example, new homeowners moved into a property in 2002 and noticed cracking two years later, but they attributed the problem to normal settling of the home. It was not until 2008 when a friend recommended the homeowners consult with a public adjuster that they learned the cracking was caused by a sinkhole and filed a claim with their insurer. The court found that whether notice was "prompt" under these circumstances was a **question for the jury**.

Other Florida courts have followed *LoBello* to reverse summary judgments entered in favor of insurers on a late-notice theory. *See e.g., Bensen v. Privilege Underwriters Reciprocal Exchange*, No. 6D23-464, 2023 WL 3668085 (Fla. 6th DCA May 26, 2023); *Cordero v. Fla. Ins. Guaranty Assoc., Inc.*, 354 So. 3d 1150 (Fla. 2d DCA 2023).

Under Florida law, whether the insured provided "prompt notice" "generally presents an issue of fact." *Rodriguez v. Avatar Prop. & Casualty Co.*, 290 So. 3d 560, 564 (Fla. 2d DCA 2020); *Laquer*, 167 So. 3d at 474 (reversing summary judgment in insurer's favor on late notice issue).

Plaintiff has explained that it was not aware of the malfunction when it provided its initial notice concerning the Formwork loss. Perhaps a jury will accept that argument; perhaps it won't. There are cases where summary judgment on late notice is appropriate, but there are issues of fact here "concerning when a reasonable and prudent person would believe that a potential claim for damages might exist." *Laquer*,

167 So. 3d at 474 (explaining that damage to insured's unit was not apparent to insured until several years after hurricane) (citing *LoBello*, 152 So. 3d at 601–02). Deciding the late notice issue here is a task involving credibility assessments -- in other words, the type of work we ask a jury to perform.

Of course, even if an insured's notice was untimely, the insured has the ability to prove that the insurer was not prejudiced by untimely notice. During this step, prejudice to the insurer is presumed and the insured bears the burden of proving otherwise. *Id.* at 474–45 (citing *Bankers Ins. Co. v. Macias*, 475 So. 2d 1216, 1218 (Fla. 1985)).

The JV has submitted evidence to demonstrate that the delay was not prejudicial to ACE. For example, it points out that ACE had two separate opportunities to visit the Project site and take sample of the damaged concrete and to assess the Plant -- but it failed to do so. Therefore, Plaintiff says, ACE's summary judgment argument is an improper attempt to "impute its failure to conduct a reasonable investigation onto [Plaintiff] to withhold coverage under the Policy."

To parrot a point presented earlier about the late notice argument, a jury might conclude that Plaintiff met its burden of proving that ACE was not, in fact, prejudiced. The issues of prompt notice and prejudice are logically tied to the issue of when Plaintiff's duty to provide notice was triggered. *Id.* at 475. Therefore, ACE will be able to make its late notice presentation to the jury and the JV will have the opportunity to

meet its burden of showing a lack of prejudice to ACE if the jury concludes that the notice was late.

**CONCLUSION**

The Undersigned **denies** ACE's summary judgment motion.

**DONE** and **ORDERED**, in Chambers, in Miami, Florida, on January 12, 2024.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All Counsel of Record

66